[No. A064522. First Dist., Div. Two. Jan. 24, 1995.]

COOPER COMPANIES, INC., Plaintiff and Appellant, v.
TRANSCONTINENTAL INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Heller, Ehrman, White & McAuliffe, Marie L. Fiala, Mary A. Gandesberry and David B. Goodwin for Plaintiff and Appellant.

Larson & Burnham, Eric R. Haas, Thomas M. Downey and David H. Waters for Defendant and Respondent.

Hancock, Rothert & Bunshoft and James P. Barber as Amici Curiae.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

This is an appeal from a declaratory judgment entered in favor of the insurer, respondent Transcontinental Insurance Company (Transcontinental), and against the insured, appellant The Cooper Companies, Inc. The trial court held that two liability insurance policies issued to Cooper Laboratories (Cooper Labs), and its wholly owned subsidiary, CooperVision (later renamed The Cooper Companies; hereafter sometimes Cooper) by Transcontinental from July 1, 1982, to August 1, 1985 (policy period) did not provide coverage[1] to Cooper and two of its subsidiaries, which were acquired after the expiration of the policy period, for bodily injury claims arising during the policy period alleged to have been caused by breast implants manufactured and distributed by the two subsidiaries. We affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Cooper Labs was a Palo Alto-based company that, in the early 1980's, manufactured and sold various medical and dental drugs, devices and diagnostics. During that period, it also pursued a policy of acquiring and divesting itself of businesses that developed and/or marketed other such products, as well as ophthalmic and orthopedic devices, birth control devices and surgical lasers. In March of 1980, it consolidated some of its product lines into a new subsidiary, CooperVision, Inc., which in 1987 was renamed The Cooper Companies, Inc. Cooper Labs "spun off" CooperVision to its shareholders in 1983, after which the latter became, and was operated as, an independent entity. Cooper Labs continued its "spin off" and sale strategy and eventually dissolved in 1985. Thereafter, CooperVision adopted its parent company's strategy of buying and selling various businesses manufacturing and marketing medical and dental devices and products.

Effective July 1, 1982, and continuing for a little over three years thereafter, until August 1, 1985, Transcontinental issued to Cooper Labs and

---

[1] For purposes of this opinion, "coverage" refers to both the duty to indemnify and the duty to defend.

CooperVision the two occurrence liability insurance policies at issue here (sometimes hereafter jointly referred to as the policies).[2] The first policy is entitled Special Excess Liability Policy—Excess Products and Completed Operations Only (products policy); it provides $50,000 coverage per occurrence over a $1 million retained limit with total payment limited to $50,000 during each policy year. The second policy is entitled Commercial Umbrella Liability Policy (umbrella policy), which provides $10 million of products liability coverage per policy year, under two separate insuring agreements: (a) coverage A, which provides "following form" excess coverage on top of the products policy; and (b) coverage B, which provides umbrella coverage in excess of a $10,000 retention for claims that fall within the umbrella policy's own insuring agreement, but are not covered by the products policy.

Because Cooper Labs desired to minimize any potential gaps in coverage that could arise in light of its strategy of buying and selling companies, as originally drafted both policies contained a named insured endorsement that was, at least in one respect, unusual; it stated that "[t]he named insured, of the declarations shall read: Cooper Laboratories, Inc., and any organization, association or business entity *now existing or hereafter a[c]quired*, in which Cooper Laboratories, Inc. owns an interest of fifty percent (50%) or more over which Cooper Laboratories, Inc. ex[]ercises active management and control. Such organization, association or entity as described herein *shall include subsidiary or organizations standing in like relationship to such organization, association or entity*, and shall include any employee club or association which is sponsored or approved by the management of Cooper Laboratories, Inc." The unusual feature of this endorsement, at least as compared to industry practice as established in the court below, was the broadening of the named insured coverage by the inclusion of the words "or hereafter acquired" without the inclusion of any further temporal limitation.

In 1987, almost two years after both policies had expired, and also two years after the original insured, Cooper Labs, had dissolved, Cooper acquired two companies, Natural Y Surgical Specialties, Inc. (Natural Y) and Aesthetech Corporation (Aesthetech), both of which manufactured and sold breast implants. Cooper divested itself of these companies in 1988 but, in the process, retained their liabilities.[3] Prior to the 1988 sale, neither of these briefly held subsidiaries of Cooper had experienced much exposure to breast

---

[2] When Cooper Labs spun off CooperVision, the policies were endorsed to continue to provide coverage to CooperVision.

[3] Natural Y and Aesthetech were purchased by Medical Engineering Corporation (MEC), a subsidiary of the entity now known as Bristol-Myers Squibb Company. After the sale, litigation ensued over responsibility for breast implant claims arising prior to the sale. In October 1992, after trial, the Delaware Court of Chancery ruled against Cooper, finding that

implant claims. This situation started to change in 1990 and, by 1993, over 1,400 lawsuits were on file against Cooper or one or both of the two subsidiaries. One of these lawsuits resulted in a $4.5 million jury verdict in New York state court, shortly after which Cooper tendered to Transcontinental the defense of the breast implant claims against it or either subsidiary arising during the policy period. Transcontinental denied coverage and this declaratory relief action ensued.

The parties commendably stipulated to much that expedited the trial and this appeal. First of all, they stipulated to bifurcate the trial into two phases, phase I to address the issue of whether the policies, with their "after acquired" language, provided coverage to Cooper or either subsidiary, and phase II to address other coverage issues. The parties agreed that there would be no need to proceed to phase II if Transcontinental prevailed in phase I. The parties also stipulated to many basic background facts and assumptions, including that some or all of the bodily injury alleged in the breast implant suits occurred during the policy period and that Cooper has exhausted its retention requirements under the policies.

The case was tried over three trial days to the court, sitting without a jury. On October 5, 1993, the court issued a statement of tentative decision which, with minor modifications, became final in December of that year. The trial court concluded that the "hereafter acquired" language in the named insured endorsement was ambiguous, but that an insured who purchased the policies would have an objectively reasonable expectation only for coverage of companies acquired during the policy period. The court therefore held as a matter of law that the policies do not provide coverage for Natural Y and Aesthetech or for Cooper's liability for the tortious conduct of these two subsidiaries.[4]

## III. Discussion

### A. *Standard of Review*

■  Based upon differing views of the evidence presented to the trial court, the parties urge disparate standards of review to govern this appeal.

it had retained or assumed liability for all breast implant claims arising from the sale of Natural Y products prior to the MEC purchase of the company, irrespective of when such claims are brought.

[4]Anticipating this appeal, the trial court also resolved two further issues in its statement of decision in case this court disagreed with its interpretation of the named insured endorsement. Since we uphold the trial court's judgment in favor of Transcontinental, we do not reach those issues.

After reviewing the record, we agree with appellant that the trial court's interpretation of the insurance policies in this case is subject to de novo review.

The interpretation of an insurance contract, as with that of any written instrument, is primarily a judicial function. (*Devin* v. *United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1157-1158, fn. 5 [8 Cal.Rptr.2d 263].) Unless the interpretation of the instrument turns upon the credibility of conflicting extrinsic evidence, a reviewing court makes an independent determination of the policy's meaning. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Masonite Corp.* v. *Great American Surplus Lines Ins. Co.* (1990) 224 Cal.App.3d 912, 916 [274 Cal.Rptr. 206].)

In the present case, the relevant extrinsic evidence is not in dispute. First, while the testimony of the parties' experts regarding the scope of the disputed policy language differed, the meaning of the policy is a question of law about which expert opinion testimony is inappropriate. (See *Suarez* v. *Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1406-1407 [254 Cal.Rptr. 377] [upholding trial court ruling excluding opinion testimony regarding reasonable interpretation of policy language]; *Devin* v. *United Services Auto. Assn.*, *supra*, 6 Cal.App.4th at pp. 1157-1158, fn. 5 [expert testimony that complaint alleged facts triggering coverage improper and not a bar to granting nonsuit].) The conflicting expert testimony has no effect on our duty to independently interpret the policy language. (Cf. *Suarez* v. *Life Ins. Co. of North America*, *supra*, 206 Cal.App.3d at p. 1407 [independently interpreting policy language and affirming summary judgment, notwithstanding expert testimony supporting contrary interpretation].) Second, as recognized by Cooper, the trial court did not make a finding of fact regarding the origin of the language comprising the named insured endorsement, the only potentially material issue about which conflicting extrinsic evidence was received. As will become apparent, however, this issue is not germane to our resolution of the appeal.

### B. *Interpreting the Policies*

■■■ The threshold issue in this appeal is the meaning of the "hereafter acquired" language in the named insured endorsements.[5] Cooper contends that the absence of specific temporal limitations on this language mandates the conclusion that coverage was intended to extend in perpetuity to companies acquired after the policy period. Transcontinental, on the other hand,

---

[5]We note that this same issue is one of many pending before our Supreme Court in *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1993) 35 Cal.App.4th 192

argues that coverage is limited to companies acquired during the policy period. The trial court ruled in favor of Transcontinental, concluding as a matter of law that an insured would have an objectively reasonable expectation of coverage *only* for companies acquired during the policy period.

Cooper urges that, in so ruling, the trial court misapplied the basic rules of interpretation applicable to insurance policies. As we shall explain, the trial court correctly applied the basic framework for insurance policy interpretation set forth by our Supreme Court in a trilogy of recent decisions. (See *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-823 [274 Cal.Rptr. 820, 799 P.2d 1253] [hereafter *AIU*]; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] [hereafter *Bank of the West*]; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263] [hereafter *Bay Cities*].)

1. *Framework for Insurance Policy Interpretation*

■    In *AIU* the high court explained the three-step process for insurance policy interpretation. First, the court instructed that the primary goal of interpreting an insurance policy, like any contract, is to give effect to the mutual intent of the parties at the time they formed the contract. (*AIU, supra*, 51 Cal.3d at pp. 821-822.) This intent is inferred, if possible, solely from the written provisions of the contract. (*Id.* at p. 822.) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" (*Ibid.*)

Second, if the court is faced with ambiguous policy language, the ambiguity is resolved by interpreting the ambiguous provision in the sense in which the promisor (insurer) reasonably believed, at the time of making it, that the promisee (insured) understood it. (*AIU, supra*, 51 Cal.3d at p. 822.)

Third, if the ambiguity is not eliminated through application of the above rule, *then* the ambiguous language is construed against the party who caused the uncertainty to exist. (*AIU, supra*, 51 Cal.3d at p. 822.) In most circumstances, the ambiguous language therefore is construed in favor of the insured. (*Ibid.*; cf. *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 [204 Cal.Rptr. 435, 682 P.2d 1100] [general rule inapplicable where sophisticated parties negotiate and jointly draft language in question].)

[26 Cal.Rptr.2d 35] (published to permit tracking pending review; review granted Jan. 27, 1994 (S023768)).

In *Bank of the West*, the high court "clarified" the rules for interpreting allegedly ambiguous insurance policies (*American Motorists Ins. Co. v. Allied-Sysco Food Services, Inc.* (1993) 19 Cal.App.4th 1342, 1349 [24 Cal.Rptr.2d 106]; see also *Transamerica Ins. Co. v. Superior Court* (1994) 29 Cal.App.4th 1705, 1714 [35 Cal.Rptr.2d 259]) as follows: "If contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.] [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citations.]" (*Bank of the West, supra,* 2 Cal.4th at pp. 1264-1265, italics in original.)

In *Bay Cities*, the Supreme Court again reiterated the basic interpretative framework developed in *AIU* and *Bank of the West.* (*Bay Cities, supra,* 5 Cal.4th at p. 867.) While observing that, in interpreting an insurance policy, "reliance on common understanding of language is bedrock," the court also noted that the requirements of "reasonableness and context" are "equally important." (*Ibid.*) The court explained: "First, '[a]n insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable*.' [Citation.] 'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' [Citation.] Second, '[*l*]*anguage in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citations.] 'There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application.' [Citation.]" (*Ibid.*; italics in original.)[6]

---

[6]The Supreme Court recently filed its decision in *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27 [36 Cal.Rptr.2d 100, 884 P.2d 1048]. The court held that no reasonable construction of the workers' compensation insurance contract at issue in that case provided coverage for (and thus an obligation to defend) a former employee's civil suit alleging wrongful termination in violation of public policy. (*Id.* at p. 31.) We need

### 2. *Applying the Framework to Interpret the Named Insured Endorsements*

■■■ Our task is to apply the foregoing principles in order to determine the meaning of the disputed "hereafter acquired" language in the named insured endorsements. In so doing, the first question we address is whether the "hereafter acquired" language is ambiguous with respect to whether Natural Y and Aesthetech, companies acquired after the policy period, qualify as named insureds. (*Bay Cities, supra*, 5 Cal.4th at pp. 867-868.)

In interpreting the policy language, we first look to the "ordinary and popular sense" of the words used. (*AIU, supra*, 51 Cal.3d at p. 822.) As the trial court correctly ascertained, the ordinary and popular meaning of "hereafter" denotes a time in the future. (Webster's Seventh New Collegiate Dict. (1972) p. 389; Black's Law Dict. (5th ed. 1979) p. 653.) Thus, the policies clearly provide coverage for damages attributable to the products of a company acquired after the policy period began. The policy language, however, does not define *how long after* the inception of the policies the endorsements continued to apply. In the absence of a temporal restriction, "hereafter acquired," could refer in the abstract to either companies acquired at any time in perpetuity (as Cooper contends) or companies acquired after the inception of the policies but before the policies expired (as Transcontinental contends).

Transcontinental urges that Cooper's proffered interpretation of the "hereafter acquired" language is facially unreasonable and therefore the language is unambiguous. (See *Bay Cities, supra*, 5 Cal.4th at pp. 867-873 [resolving potential ambiguity by finding proffered definition of "related" "not reasonable"].) Transcontinental correctly observes that construing a contract to confer a right in perpetuity is clearly disfavored. (See *Nissen v. Stovall-Wilcoxson Co.* (1953) 120 Cal.App.2d 316, 319 [261 P.2d 10]; *Zimco Restaurants v. Bartenders Union* (1958) 165 Cal.App.2d 235, 238-239 [331 P.2d 789].) The reasons for such disfavor are readily apparent. The troubling ramifications of construing the "hereafter acquired" language to run in perpetuity can be illustrated in the context of this case by the following hypothetical: Under Cooper's interpretation of the named insured endorsement, coverage for asbestosis claims arising during the policy period would be available under the policies if Cooper acquired the Johns-Manville Corporation during the course of this litigation. As a result, the bankrupt

---

not review this decision in any detail and only note that it applies the rules of insurance contract interpretation described above to determine that the contract language in question was unambiguous. (*Id.* at pp. 41-43, 46.)

Manville Trust would again have assets, i.e., the Transcontinental policies. (*Maryland Cas. Co.* v. *W.R. Grace & Co.* (S.D.N.Y. 1991) 794 F.Supp. 1206, 1231 [originating the hypothetical in the context of a declaratory relief action denying coverage for an acquiring company for asbestosis injuries attributable to the products of an after-acquired company].) Such a result would be required even though Cooper and Johns-Manville were strangers at the time the policies were written and Transcontinental had no opportunity to underwrite or receive compensation for the increased risk.

While agreeing that the result of this hypothetical appears unreasonable, we must consider the purportedly ambiguous language in the context of the entire policy and the actual claim. (*Bank of the West, supra,* 2 Cal.4th at p. 1265; *Bay Cities, supra,* 5 Cal.4th at p. 867; see also *American Motorists Ins. Co.* v. *Allied-Sysco Food Services, Inc., supra,* 19 Cal.App.4th at pp. 1351-1352.) We note that Cooper was, at the time the policies were issued, essentially in the business of acquiring companies that manufactured medical and dental products. Furthermore, both policies contain an endorsement defining coverage for "ethical pharmaceutical" products.[7] Utilizing well-known policy language, each of these endorsements, in contrast to the named insured endorsements, specifically sets forth steps to secure coverage under the policies for products manufactured "by entities or subsidiaries acquired during this policy period . . . ." In light of Cooper's known business activities and the specific temporal limitation found in these special endorsements in the policies in question, we cannot conclude that Cooper's proposed interpretation of the "hereafter acquired" language is inherently unreasonable or contrary to the ordinary and popular meaning of the language in the policy.

Since an apparent ambiguity remains, we follow the Supreme Court's directive to interpret the policies in the sense in which respondent believed, at the time of contracting, that appellant understood them. (*AIU, supra,* 51 Cal.3d at p. 822; *Bank of the West, supra,* 2 Cal.4th at pp. 1264-1265.) In so doing, we are instructed not to look to the insurer's subjective beliefs, but rather to determine "whether coverage is consistent with the insured's objectively reasonable expectations." (*Bank of the West, supra,* 2 Cal.4th at p. 1265.)

Appellant, however, contends that this second prong of our high court's interpretative framework is inapplicable in light of the record in this case.

---

[7]An "ethical pharmaceutical" is defined in the policies as "any drug or medicine which cannot be distributed to the general public by any means other than through the prescription of a licensed physician . . . ."

Appellant points out that this prong was derived from Civil Code section 1649 (section 1649). According to appellant, "courts have used Civil Code section 1649 to resolve an ambiguity in a contract *only* when extrinsic evidence in the record establishes the *actual mutual understanding* of the parties as of the time they entered into the contract concerning the meaning of the ambiguous contract provision." Therefore, Cooper continues, in the absence of evidence establishing an actual mutual understanding, the court must proceed directly to the third prong of the interpretative framework and construe the policy language against the insurer.

In light of *Bank of the West* and *Bay Cities*, Cooper's argument is flawed.[8] In both cases, our Supreme Court relied upon the "objectively reasonable expectations" of the insured in determining whether coverage was available. (*Bank of the West, supra*, 2 Cal.4th at pp. 1272, 1276; *Bay Cities, supra*, 5 Cal.4th at p. 873.) The high court in neither case attempted to discern an "actual mutual understanding" of the parties regarding the disputed policy language before evaluating the "objectively reasonable expectations" of the insured.

Cooper's argument to the contrary relies primarily upon decisions pre-dating *Bank of the West* and decisions resolving claims outside of the insurance context. Although section 1649 was cited as authority in *AIU* and *Bank of the West*, the Supreme Court has provided guidance regarding how the rule embodied in that statute is to be applied in the insurance context. Decisions antedating *Bank of the West* necessarily do not reflect the Supreme Court's guidance in this regard. Decisions from outside the insurance context are also relatively unhelpful. Where our Supreme Court has provided recent and explicit guidance for the interpretation of insurance policies, there is little need for us to resort to decisions from other contexts.

Nor does Cooper's reliance upon the decision of Division One of this Court in *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715 [15 Cal.Rptr.2d 815] convince us that the high court decisions must be interpreted as it urges. That opinion neither analyzes nor applies the "second prong" of the high court's interpretative framework. Rather, the court found the policy language in question unambiguous in light of its ordinary and popular meaning.

Cooper attempts to salvage its position by arguing that *Bank of the West* (and by implication *Bay Cities*) does not control the present case because in

---

[8]Cooper requests that this court take judicial notice of the briefs filed in the Supreme Court in the *Bank of the West* case. We decline to exercise our discretionary authority to do so. (Evid. Code, § 459, subd. (a).) We believe it would be inappropriate for this court to review the briefing of a Supreme Court case in order to, essentially, second-guess clear directions from that court.

*Bank of the West* the Court concluded that the policy language was unambiguous. Cooper reads that decision entirely too narrowly. First, as indicated above, Cooper ignores the portion of the *Bank of the West* decision that clearly employs the "objectively reasonable expectations" prong of the interpretive framework to resolve asserted ambiguities in the meaning of the policy term "advertising injury" against coverage. (*Bank of the West, supra,* 2 Cal.4th at p. 1273 et seq.) Moreover, Cooper fails to recognize that the portion of the *Bank of the West* decision holding that the policy term "unfair competition" does not refer to conduct violating the Unfair Business Practices Act rests in part upon the court's conclusion that such an interpretation would not "reflect the objectively reasonable expectations of the insured." (*Id.* at p. 1272.)

Second, we believe that Cooper places too much emphasis upon precisely when the label "ambiguous" is attached to the policy language in dispute. Whether the "objectively reasonable expectations" of the insured should be considered as part of the first prong of the *AIU* analysis before the "ambiguous" label attaches or as a separate second prong after that label attaches, our Supreme Court has clearly instructed that, prior to construing "assertedly ambiguous policy language" against an insurer, we "must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations." (*Bank of the West, supra,* 2 Cal.4th at pp. 1265, 1272, 1275-1276; see also *ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1788 [22 Cal.Rptr.2d 206].) In sum, Cooper's argument that once the language is found to be ambiguous it must be construed against the insurer appears to be principally an effort to excise the "objectively reasonable expectations of the insured" from the analysis, and this we may not and will not do.

We therefore turn to the question of whether the coverage sought by Cooper is consistent with an insured's "objectively reasonable expectations." In resolving this question, we are instructed to "interpret the language in context, with regard to its intended function in the policy. [Citation.]" (*Bank of the West, supra,* 2 Cal.4th at p. 1265.) We may also employ "common sense." (*Id.* at p. 1276.) For the following reasons, we conclude, as did the trial court, that the only interpretation of the policy consistent with the objectively reasonable expectations of the insured and common sense is one that extends coverage only for the activities of acquisitions made during the policy period.

Consistent with our conclusion, the record in this case establishes that the intended purpose of the "hereafter acquired" language was to avoid gaps in

Cooper's coverage arising from failure to promptly report an acquisition to its insurer by ensuring coverage for acquisitions until specific insurance arrangements could be made for the new acquisitions.[9]

Moreover, the insurance policies in question obviously contain a finite policy period. In these occurrence policies, this period serves both to circumscribe the time in which an insurable event may occur and to provide a time for auditing for purposes of fixing premiums. Of importance here is the truism that unless coverage has been triggered under these occurrence policies within the policy period, there is no coverage once the policy period has ended. (See 11 Couch on Insurance (2d ed. 1982) § 44:8, p. 193.) Therefore, we believe it logically follows that a named insured cannot be added once the policy period has ended. A corporate acquisition occurring after the policy period can have no retroactive effect on the identity of the named insured. In accordance with this view, Transcontinental's expert, Donald Way, opined that in the absence of temporal language specifically applicable to the named-insured endorsements, the policy inception and expiration dates necessarily provide the appropriate limitation. As the trial court observed, such an interpretation "makes sense." On the other hand, Cooper's proposed interpretation leads to unreasonable and, we believe, unintended results.[10] While we recognize that elsewhere in the policies the parties explicitly limited Transcontinental's obligations to products manufactured "by entities or subsidiaries acquired during the policy period," we do not believe that any reasonable insured would interpret the dissimilar

---

[9]Relying upon *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11 [92 Cal.Rptr. 704, 480 P.2d 320], Cooper argues that extrinsic evidence has no role in the resolution of this dispute. Specifically, Cooper contends that such evidence is inadmissible in cases where "form language" is construed. Assuming that the language in question is form language for purposes of this argument, in the insurance context our Supreme Court has directed us to consider the "reasonable expectations of the insured," prior to invoking the rule of *contra proferentum* relied upon in the *Tahoe National Bank* decision. (*Bank of the West, supra,* 2 Cal.4th at pp. 1265, 1272, 1275-1276; see also *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 443 [91 Cal.Rptr. 6, 476 P.2d 406] [confirming admissibility of extrinsic evidence to establish parties' intent when insurance policy terms ambiguous].)

[10]We do not find persuasive Cooper's attempt to analogize the present situation to those found in *AIU* and similar cases where coverage for causes of action first articulated after the policy period by statute or court decision was found under comprehensive general liability (CGL) insurance policies. As the courts have recognized, under the standard CGL policy the insured contracts for complete or comprehensive coverage for a given risk, and under such circumstances the insurer must provide coverage when the scope of the risk is subsequently enlarged. (E.g., *AIU, supra,* 51 Cal.3d at p. 822, fn. 8; *Travelers Ins. Co.* v. *Industrial Indem. Co.* (1971) 18 Cal.App.3d 628, 631-632 [96 Cal.Rptr. 191].) Neither the comprehensive nature of a CGL policy nor any other principle enunciated in these cases compels the conclusion that an insured reasonably contemplates coverage for the products of a company that is a stranger to the insured-insurer relationship during the policy period.

"hereafter acquired" language to provide coverage in perpetuity. Rather, in the absence of an explicit temporal limitation, we find that a reasonable insured would conclude that the language is limited by the policy period.[11] (*Total Waste Management* v. *Commercial Union Ins. Co.* (D.N.H. 1994) 857 F.Supp. 140, 150.)

Our view that an insured would reasonably expect that the "hereafter acquired" language covered only acquisitions made during the policy period is further supported by the manner in which premiums were assessed under the policies. A minimum premium, based upon the estimated gross sales of the named insureds, was paid at the inception of the policies. The ultimate premium, as is common for liability policies (see 14 Appleman, Insurance Law & Practice (1985 rev.) § 7848.25, p. 122), was based upon an audit of the gross sales of the named insureds. When Cooper acquired a new company during the policy period it reported the acquisition to its broker who in turn reported the acquisition to Transcontinental. At the end of the policy period, Transcontinental recalculated Cooper's premium by including the sales of any companies acquired. In the case of after-acquired companies, such as Natural Y and Aesthetech, no mechanism existed for Transcontinental to assess premiums for additional risk assumed. Given such a premium structure, neither Cooper nor any other insured could reasonably expect that after-acquired companies would be covered under the policies.[12]

---

[11]In an admittedly far different context, Division One of this court has held that a drive-in restaurant labor agreement that contained no fixed term could not reasonably be interpreted as applying in perpetuity. It stated: "Webster defines 'perpetual' to mean 'continuing forever; everlasting; eternal.' Can it be maintained that these parties had such results in mind? [¶] It is difficult to conceive that parties dealing with the business of drive-in restaurants intended a contract to last forever. The history of technological developments . . . in the organization of American industry has produced a modern miracle where change, not perpetual status, is the order of the day." (*Zimco Restaurants* v. *Bartenders Union, supra*, 165 Cal.App.2d at p. 239.) Whether or not today's insurance industry is as dynamic as the 1950's restaurant industry, the legal point made is still instructive in the present case, especially with regard to a "common sense" interpretation of the reasonable expectations of the parties.

[12]Cooper objects to the use of evidence relating to the premium structure in order to interpret the policy language in question. In particular, Cooper contends that the record is devoid of evidence that Cooper understood, or a layperson would have understood, the method of calculating the premium set forth in the policy at the time the policy was issued. The audited nature of the premium was conveyed in the policy by the following language: "The earned premium for the policy period shall be computed by application of the rate shown in the policy declarations to the audited exposure base." The policy demonstrated that the earned premium was calculated based on the named insureds' gross receipts (sales). Contrary to Cooper's argument, we find that, in the context of liability coverage for product sales, a layperson would understand this language to convey the premium structure that was described during the trial.

Furthermore, the record below establishes that coverage for the pre-acquisition torts of after-acquired companies was not available for purchase in the marketplace at the time the policies were written. Therefore, we believe neither Cooper nor any other insured could have held an objectively reasonable expectation that it was purchasing such coverage in the absence of specific negotiations to acquire it.[13]

Finally, we note that the testimony relating to Cooper's actual understanding of the coverage it was purchasing is not inconsistent with our view of how an objectively reasonable insured would interpret the policy language. While Cooper was concerned about covering a potential gap in its coverage for its acquisitions, the record establishes that Cooper never possessed an affirmative belief that it was purchasing coverage for companies acquired after the policy period. The witnesses who testified on behalf of Cooper either did not provide testimony regarding Cooper's expectations at the time the policy was purchased or admitted not considering whether the policies provided coverage for companies acquired after the policies expired. Cooper's handling of the breast implant claims at issue here provides further evidence that Cooper possessed no expectation of coverage for those claims. Cooper knew that breast implant suits were pending against Natural Y and Aesthetech at the time it purchased these companies. The policies specifically required that documentation relating to claims or suits against an insured immediately be forwarded to Transcontinental.[14] Nevertheless, Cooper did not report those known suits to Transcontinental until a large verdict was returned in 1991, four years after the acquisitions and six years after the policies expired. Our interpretation of the policy language therefore is not only in accord with the objectively reasonable expectations of an insured, but also does not violate any expectation of coverage, whether reasonable or not, that Cooper actually held at the time the insurance was purchased.

Cooper cites one published decision as direct authority contrary to our holding. (*John Deere Ins. Co.* v. *Shamrock Industries, Inc.* (D.Minn. 1988)

---

[13]Cooper's expert, James Morrow, attempted to provide a reason for why Transcontinental would have written policies including perpetual coverage for after-acquired companies. Morrow opined that the temporal limitation was omitted from the policies in response to a soft insurance market. We agree with the trial court that Morrow's explanation is not credible. In the absence of at least some specific evidence to the contrary, we cannot believe that any company, simply to retain a business account in a soft market, would write coverage (a) not otherwise available in the market, (b) which would last in perpetuity, and (c) for which the insurer would have no opportunity to assess risks and collect premiums.

[14]The policies provide, "If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company [Transcontinental] every demand, notice, summons or other process received by him or his representative."

696 F.Supp. 434, affd. (8th Cir. 1991) 929 F.2d 413 (*John Deere*).) The issue in that case was not coverage for the preacquisition torts of an after-acquired company, but whether a newly formed company was "controlled and actively managed" by another company. While the court did rule that coverage was available for the newly formed corporation under policies issued both before and after its incorporation, it did not consider whether the policy in effect on and after the incorporation date and the prior policy that contained the same "control" language should apply differently. Because the issue decided by the *John Deere* court is wholly distinguishable from the issue in this case, the decision in that case is neither on point nor persuasive.

On the other hand, we find the recent decision in *Total Waste Management* v. *Commercial Union Ins. Co., supra,* 857 F.Supp. 140, to be on point and persuasive. The issue presented in that case was whether three insurance companies owed a duty to defend and indemnify Total Waste Management "for liability arising from the pre-acquisition activities of George West, an after-acquired entity." (*Id.* at p. 146.)[15] After surveying the numerous unpublished opinions addressing this issue, the court held that the insurers owed no such duty. The court concluded that Total Waste Management's interpretation of the policies "contradicts the plain language of the effective dates of the policies and the reasonable expectations of the parties. [Citation.]" (*Id.* at p. 150.)[16]

---

[15]Two of the three insurers issued policies containing the following provision: "AUTOMATIC COVERAGE-NEWLY ACQUIRED ORGANIZATIONS (90 DAYS). The word *insured* shall include as *named insured* any organization which is acquired or formed by the *named insured* and over which the *named insured* maintains ownership or majority interest, other than a joint venture, provided this insurance does not apply to *bodily injury, property damage, personal injury* or *advertising injury* with respect to which such new organization under this policy is also an *insured* under any other similar liability or indemnity policy or would be an *insured* under any such policy but for exhaustion of its limits of liability. The insurance afforded hereby shall terminate 90 days from the date any such organization is acquired or formed by the *named insured* ('after-acquired provision')." (*Total Waste Management* v. *Commercial Union Ins. Co., supra,* 857 F.Supp. at p. 144.)

[16]The parties' briefs were extremely thorough, providing numerous citations to both California and other authority. Whether or not specifically discussed herein, we reviewed all of the authorities cited by the parties. We conclude that the vast majority of these authorities require no discussion since they are duplicative of general principles contained in the cases discussed above or are distinguishable on factual or legal grounds.

Because Transcontinental claims that *Oliver Machinery Co.* v. *United States Fid. & Guar. Co.* (1986) 187 Cal.App.3d 1510 [232 Cal.Rptr. 691] *mandates* resolution of this dispute in its favor, we briefly observe that, while we conclude the decision supports our holding, we find that it addressed significantly different facts and issues. The relevant question in that case was whether the scope of a vendor's broad form endorsement that provided coverage for distribution of the products of the named insured extended to products distributed by the vendor on

In summary, we conclude that an insured purchasing these policies would have an objectively reasonable expectation of coverage only for companies acquired during the policy period. The asserted ambiguity resulting from the words "hereafter acquired" must be resolved accordingly. Since Natural Y and Aesthetech were acquired two years after the expiration of the policies, no coverage exists under these policies for Natural Y and Aesthetech or for Cooper's possible liability for the tortious conduct of these after-acquired subsidiaries.

## IV.  DISPOSITION

The judgment of the trial court is affirmed.

Kline, P. J., and Smith, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 13, 1995.

---

behalf of the named insured's predecessor corporation. The court held that such coverage was beyond the reasonable expectations of both the insured and the insurer. (*Id.* at p. 1518.)