[No. A082952. First Dist., Div. One. June 11, 1999.]

GEORGE B. MITROFF, Plaintiff and Appellant, v.
UNITED SERVICES AUTOMOBILE ASSOCIATION, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 3.

## COUNSEL

Johns, Helmueller & Christensen, Christopher Johns, Jennifer A. D. Lehman; Laing Law Offices and Bruce Laing for Plaintiff and Appellant.

Huber Samuelson, Jacquelyn K. Wilson and Charles R. Roe for Defendant and Respondent.

## OPINION

**MARCHIANO, J.**—George B. Mitroff appeals from a summary judgment in favor of his insurance carrier, United Services Automobile Association (USAA), in an action for damages for breach of USAA's duty to defend him against a complaint for assault and battery filed by Mitroff's wife, Sherry Lamb. We affirm because appellant's wife was a resident of his household, thereby precluding liability coverage for bodily injury to her as an insured under the policy's household exclusion.

BACKGROUND

Mitroff and Lamb were married for the first time in May of 1982, and lived in Mitroff's house at 1440 Enchanted Way.[1] Within two months, they had separated and were divorced in 1984. Mitroff and Lamb remarried on the 4th of July in 1985. Mitroff again moved into the Enchanted Way residence in 1987. The second marriage was longer than the first, but by July 17, 1993, due to marital discord Mitroff and Lamb agreed to a date of separation. As a part of their agreement, they continued to live at Enchanted Way. Lamb and her mother, Elsie Butts, lived in the downstairs portion of the house, while Mitroff lived upstairs. Mitroff and Lamb shared the living room and kitchen areas of the house. Mitroff and Lamb did not socialize or eat meals together after the agreed date of their separation, but Mitroff gave Lamb money to buy food. Mitroff continued to pay the mortgage and utilities for the residence on Enchanted Way. Following altercations on October 29 and 31, 1993, Mitroff told Lamb to leave. A final judgment of dissolution was filed on December 29, 1995.

On September 16, 1994, Lamb filed a complaint against Mitroff alleging that he assaulted her during the October 29 and 31 altercations. Specifically, the complaint alleged four causes of action: assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. The factual allegations of the complaint set out the dates of the two marriages, and alleged generally: "[t]hroughout the twelve (12) year relationship between plaintiff and defendant, defendant has been both physically and verbally abusive to plaintiff." More specifically, the complaint referenced the time period from October 29 through October 31, 1993. Regarding that period, the complaint alleged that Mitroff "assaulted and battered plaintiff and hit her in and around the face and head, pushing her and pulling her hair and arms." The complaint contained detailed allegations about an event on October 31, alleging that Mitroff picked Lamb up and threw her across the room, choked her, hit her around the face and head, and told her "If I could get away with it, I'd kill you," and "The next time you decide to breathe, you'd better ask me first."[2] Lamb's complaint alleged that she sought medical treatment after this assault. The complaint sought general damages, medical expenses and punitive damages.

On October 11, 1994, Mitroff tendered defense of Lamb's complaint to USAA. During all relevant times, the Enchanted Way residence and Mitroff

[1]According to the allegations of Mitroff's cross-complaint in Lamb's action, the couple entered into separate property agreements in all years between 1986 and 1993, which provided that the earnings, assets, and liabilities of each party would remain separate property.

[2]It appears in the record on appeal that Mitroff was 5 feet 10 inches tall and weighed between 180 and 204 pounds, while Lamb was 4 feet 10 inches tall and weighed approximately 90 pounds.

were covered by USAA homeowners insurance policies issued to Mitroff. The liability coverage in the policies provided: "If a claim is made or a suit is brought against an insured for damages because of bodily injury . . . caused by an occurrence to which this coverage applies, we will: 1. pay up to our limit of liability for the damages . . . and 2. provide a defense . . . even if the suit is groundless, false or fraudulent." The word "occurrence" was defined as: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in . . . bodily injury . . . ." Directly under the section of the policy which outlined the personal liability coverage, was a section entitled "exclusions." One of the exclusions from the liability coverage was: "bodily injury to you or an insured within the meaning of part a. or b. of 'insured' as defined." The term "insured" was defined as: "you and residents of your household who are: a. your relatives . . . ." The term "you" was defined as: "the 'named insured' shown in the declarations [Mitroff] and the spouse if a resident of the same household."

On January 25, 1995, USAA field claims representative, Wendy Pierro, interviewed Mitroff regarding the allegations of Lamb's complaint. In a letter to Mitroff's counsel, Pierro outlined the information that had been made available to USAA in addition to Mitroff's statements. In addition to Lamb's complaint, Pierro had reviewed a police report filed by Lamb on November 1, 1993, which referred to spousal abuse beginning October 29, 1993, and through the 31st, and a medical report. Pierro's letter outlined Mitroff's version of the events. Mitroff contended that on October 29 he was on the second floor of the residence eating dinner when Lamb approached him. Because he would not respond, she threw a large jar of marinated vegetables at him, missing him by inches. Mitroff ran down the hallway after Lamb, and restrained her by holding her forearms with his hands for about 15 seconds. She returned to the downstairs level and Mitroff cleaned up the vegetables. On October 31, Lamb came upstairs to complain because Mitroff had told her to shut off a battery-operated Halloween witch. Mitroff said he did not wish to speak to her, and told her to move out of the house by the next week. Approximately 15 seconds later, Mitroff heard a loud crash and heard Lamb running down the hallway. He ran downstairs and caught her by the forearms to restrain her. He again told Lamb that he wanted her and her mother out of the house by next week. Mitroff's attorney responded to USAA's letter, stating that the medical reports regarding the October 29 and 31 incidents showed minimal physical symptoms and no contusions. Counsel also noted that the police report furnished to USAA indicated that the police officer observed that Lamb was bruised only on her hands, wrists and

forearms.[3] Counsel clarified Mitroff's position that he restrained Lamb in self-defense because she was trying to injure him and his property. Mitroff said that he did not feel that Lamb was a threat to him if he restrained her by grabbing her forearms. When she was restrained, she ceased struggling.

On March 17, 1995, senior property claims examiner Douglas D. Dunkly notified Mitroff that USAA was declining to defend the matter based on three reasons. The first reason stated was that Mitroff admitted he intentionally grabbed Lamb, and that purposeful action could not be an "accident," under the policy's coverage provisions. The second reason was exclusion 2f, which disallowed coverage for claims between two "insureds." Because Lamb was married to Mitroff and lived in the same household at the time of the incident, she was an "insured" under the policy definitions. The third reason given was the exclusion for injury caused by acts which are intended or expected by the insured.

On January 27, 1997, Mitroff filed a complaint against USAA, for failure to defend him against his spouse's complaint, alleging breach of contract and tortious breach of the implied covenant of good faith and fair dealing. On March 6, 1988, USAA filed a motion for summary judgment, arguing that the Lamb complaint did not present an "occurrence," that the acts alleged in the complaint fell within the exclusion for claims of bodily injury to an insured, and that the acts alleged fell within the exclusion for acts expected or intended by the insured. On April 29, 1998, the court granted USAA's motion and entered judgment in favor of USAA. Mitroff appealed.

## DISCUSSION

Mitroff argues that the conduct alleged in Lamb's complaint comes within the policy definition of an "occurrence" because his claim that he acted in self-defense vitiates intent. He contends that it is possible that the pleading could be amended to allege merely negligent acts, which would come within the policy's coverage for accidents. He also argues that the trial court failed to address the allegations in the complaint that the physical and verbal abuse took place throughout the 12-year relationship, and he flatly denied any acts other than the 2 incidents in October of 1993. Mitroff also asserts that the trial court erred in denying his request for judicial notice of the pleadings in

---

[3]The police report also indicated that Mitroff pled no contest to one count of misdemeanor battery as a result of the altercation with Lamb, a plea which could not be used to establish liability in the present action. (Pen. Code, § 1016.) Mitroff objected to this report as well as other documents that were not properly authenticated by USAA in the trial court, and we do not consider those documents here. Mitroff, however, properly authenticated his counsel's response to USAA, which included discussions of the police and medical reports, as well as the depositions of himself, Pierro, and others.

two unrelated claims by other USAA insureds. In its response, USAA contends that the policy exclusion for injury to an insured is applicable as a matter of law because at the time of the injuries complained of, Lamb was Mitroff's spouse and was a resident of the same household. Relying primarily on *Jacobs* v. *Fire Ins. Exchange* (1991) 227 Cal.App.3d 584 [278 Cal.Rptr. 52], Mitroff counters that Lamb was not a resident of his household in October of 1993 because they maintained separate households at that time and had no hope or intention of resuming a normal married life. In addition, he argues that the complaint alleged 12 years of abuse, and they were not married or living together for the entire 12-year period.

Even if Mitroff is correct that there may be a possibility of coverage under certain self-defense cases, we find the "same household" exclusion is applicable as a matter of law. Mitroff interprets the language of *Jacobs* too broadly. The clear meaning of the resident of the same household exclusion is that it applies to spouses who live together under the same roof, particularly where one is still supported, at least in part, by the other.

### 1.  *Standard of Review for Summary Judgment*

■  "A defendant moving for summary judgment has the burden of 'negat[ing] a necessary element of the plaintiff's case, and demonstrat[ing] that under no hypothesis is there a material issue of fact that requires the process of a trial. [Citation.]' " (*Zelda, Inc.* v. *Northland Ins. Co.* (1997) 56 Cal.App.4th 1252, 1258-1259 [66 Cal.Rptr.2d 356].) "Once the defendant carries this substantive burden, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to the plaintiff's case." (*Id.*, at p. 1259.) "We review the trial court's ruling on [a] motion for summary judgment de novo." (*Id.,* at p. 1258.)

Mitroff argues that the trial court improperly placed the initial burden of proof on him, rather than on USAA. He notes language in the court's opinion to the effect that a "plaintiff has the burden of establishing that an event is a claim within the scope of the basic coverage." We review the court's ruling and not its reasoning. (*Ruoff* v. *Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1628 [13 Cal.Rptr.2d 755].) In any event, the court's statement is an accurate comment on Mitroff's failure to carry his burden of proof after USAA demonstrated that the undisputed facts supported the applicability of the exclusion and established that Mitroff could not prove he came within the provisions of the policy.

### 2.  *Interpretation of the Insurer's Duty Under a Contract of Insurance*

■  An insurer's duty to defend is broader than the duty to indemnify. The insurer must defend, even against claims that create only a potential for

recovery. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 299 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "An insurer, however, 'cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable. . . . [C]ourts do not examine only the pleaded word but the potential liability created by the suit.' [Citation.] Thus, 'facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. [Citation.]'" (*Eigner* v. *Worthington* (1997) 57 Cal.App.4th 188, 195 [66 Cal.Rptr.2d 808].)[4] "Our Supreme Court, anticipating imaginative counsel and the likelihood of artful drafting, has indicated that a third party is not the arbiter of the policy's coverage. [Citations.] A corollary to this rule is that the insured may not speculate about unpled third party claims to manufacture coverage." (*Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

■ Our interpretation of insurance contracts is governed by the general rules of contract construction. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666 [42 Cal.Rptr.2d 324, 913 P.2d 878].) "[T]he coverage provisions of the policy are liberally construed in favor of the insured and the exclusions from coverage are narrowly construed against the insurer. [Citation.] The duty to defend is excused only ' "if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" ' [Citations.] Therefore, if a single issue exists which is even potentially within the policy coverage, [the carrier] has a duty to defend [the insured] against [a third party] action in its entirety. [Citation.]" (*Charles E. Thomas Co.* v. *Transamerica Ins. Group* (1998) 62 Cal.App.4th 379, 382 [72 Cal.Rptr.2d 577].)

---

[4]The insurer is bound to adequately investigate the claim, and the key issue in a duty to defend case is the nature of the facts known to the insurer. For this reason, we reject Mitroff's contention that the court improperly considered hearsay evidence of the police and medical reports and statements made to USAA's agents. Those items, which were authenticated by Mitroff's submissions to the court, were relevant to the state of USAA's knowledge, which is a pertinent issue in a determination of the duty to defend. They were not presented for their truth, i.e., that Mitroff in fact battered Lamb. (*Legarra* v. *Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1487 [42 Cal.Rptr.2d 101] [evidence used to determine coverage admissible for that nonhearsay purpose].)

We do not abandon common sense when reading an insurance policy. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) We apply the meaning that a "layperson would ascribe to contract language" if it is not ambiguous. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) Prior to construing ambiguous policy language against an insurer, a court decides if the coverage, so construed, would be consistent with the objectively reasonable expectations of the insured. (*Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) "In order to do this, the disputed policy language must be examined *in context* with regard to its intended function in the policy. [Citation.] This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.' [Citation.]" (*Nissel* v. *Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1111-1112 [73 Cal.Rptr.2d 174].) With these canons of construction in mind, we review the claims on appeal.

3. *Determination of the Impact of Self-defense Is Not Necessary to Resolve the Appeal*\*

. . . . . . . . . . . . . . . . . . . . . .

4. *Lamb Was an Insured as a Matter of Law*

At the time of the specific incidents alleged in Lamb's complaint, she lived in appellant's house and was his wife. The USAA policy excludes liability for bodily injury to Mitroff's spouse "if a resident of the same household." " ' "[T]he concept of a household exclusion is a common one which has long enjoyed judicial support. Its purpose is to prevent suspect inter-family legal actions which may not be truly adversary and over which the insurer has little or no control. Such an exclusion is a natural target for the insurer's protection from collusive assertions of liability. . . ." [Citation.]' [Citations.]" (*Utley* v. *Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 822-823 [24 Cal.Rptr.2d 1].)

The facts regarding Mitroff and Lamb's physical living arrangements and her status as his wife are undisputed. Also, it has been held that

---

\*See footnote, *ante*, page 1230.

the term "household" used in the context of this type of homeowners policy, is not ambiguous. (*Jacobs* v. *Fire Ins. Exchange, supra,* 227 Cal.App.3d at p. 590.) The only issue to be determined is the legal significance to be drawn from the undisputed facts, including Mitroff's statements that he did not consider Lamb to be a member of his household, that they considered themselves to be separated, and that they did not eat or socialize together. Both parties rely on language in *Jacobs* v. *Fire Ins. Exchange, supra,* 227 Cal.App.3d 584 to support their contentions.

We have reviewed the cases involving the definition of a household in the insurance context, and note that a detailed exposition of the varying factual circumstances of these cases yields only the general proposition that, if reasonably possible, courts will interpret the same term broadly to extend coverage in the case of a coverage provision and narrowly to allow coverage in the case of an exclusion. (*National Auto. & Cas. Ins. Co.* v. *Underwood* (1992) 9 Cal.App.4th 31, 39-40 [11 Cal.Rptr.2d 316]; compare *State Farm* v. *Estate of Lazio* (N.D.Cal 1993) 822 F.Supp. 660 [son was covered by liability policy as a resident of parents' household even though he only spent one night there and intended to move to a new address] with *Island* v. *Fireman's Fund Indemnity Co.* (1947) 30 Cal.2d 541 [184 P.2d 153, 173 A.L.R. 896] [for purpose of exclusion for cars owned by member of household, son was not a member of parents' household even though he had lived there with his wife and was legally domiciled there while on military duty], see also Annot., Who Is "Resident" or "Member" of Same "Household" or "Family" as Named Insured, Within Liability Insurance Provision Defining Additional Insureds (1979) 93 A.L.R.3d 420.)

The issue in *Jacobs* involved a coverage provision which included relatives or persons under 21 " 'if permanent residents of [the insured's] household.' " (*Jacobs* v. *Fire Ins. Exchange, supra,* 227 Cal.App.3d at p. 587.) Because it was construing a coverage provision, the *Jacobs* court utilized a broad definition of the questioned term. The court in *Jacobs* reviewed definitions in *Island* v. *Fireman's Fund Indemnity Co., supra,* 30 Cal.2d 541, and other cases, and quoted language which included several subjective factors in the definition of the term "household." The *Jacobs* court settled on the following definition: "a collection of persons, whether related or not, who live together as a group or unit of permanent or domestic character, with one head, under one roof or within a common curtilage, who direct their attention toward a common goal consisting of their mutual interests." (227 Cal.App.3d at p. 594, fn. omitted.) Even under this broad definition the *Jacobs* court concluded that the tortfeasor in that case was not a resident of the insured's household.

Mitroff emphasizes the subjective considerations in the *Jacobs* definition to argue that he and Lamb did not have one head of the household or share

a common goal of mutual interests. He argues that he and Lamb decided to maintain separate households under the same roof and that he no longer considered Lamb to be a member of his household. He also directs our attention to the facts that he and Lamb did not eat their meals together and did not socialize together. USAA focuses on the more objective facts that Mitroff and Lamb were legally married to each other, lived under the same roof, that Mitroff paid the mortgage and utilities, and that he further supported Lamb with money for food.

The subjective elements relied upon by Mitroff are not dispositive. "The 'resident relative' exclusion may not be based entirely on the subjective intent of the live-in relative. Such a rule would mean that coverage expands and contracts on the whimsical plans of a dependent family member." (*Utley* v. *Allstate Ins. Co., supra,* 19 Cal.App.4th at p. 820.) None of the cases cited by Mitroff involve spouses who shared the same dwelling. For example, the tortfeasor in *Jacobs* did not live with the insured and was not a relative, but was the 18-year-old stepson of the granddaughter of the insured, who lived on the other side of the insured's duplex with his mother. The two units in the duplex were separated by a solid wall, and had separate entrances, mail boxes, backyards, kitchens, and bathrooms. (227 Cal.App.3d at p. 588.) In *Island*, the policy excepted coverage for a vehicle owned by a member of the insured's household. The son, who owned the vehicle, was away on military duty at the time of the accident, and did not physically reside in the insured's house. The court concluded he was not a member of the household, and the accident was, therefore, covered by the policy. (30 Cal.2d at p. 543.)

USAA notes the comments in *Dalton* v. *Metropolitan Property & Liability Ins. Co.* (1982) 136 Cal.App.3d 1037 [186 Cal.Rptr. 685], a summary judgment case which did involve spouses. In *Dalton*, the insured held an automobile policy prior to her marriage. Approximately three weeks after the marriage, the husband absconded with the vehicle and never returned. During the short time between the marriage and the husband's departure, the couple had lived in "various motels." (*Id.* at p. 1039.) The policy did not provide coverage for theft by an insured, and a spouse who was a resident of the same household was defined as an insured. The abandoned wife in *Dalton* argued that the issue turned on the husband's intent to return, which was a question of fact. The *Dalton* court affirmed the judgment for the carrier, and aptly noted: "A rule making the determination of whether a husband and wife are at a given moment residents of the same household turn on their momentary subjective intent would engender uncertainty, lead to great mischief and do more harm than good in terms of effecting the public policy purposes of automobile insurance." (*Id.* at p. 1041.)

In *Reserve Insurance Co.* v. *Apps* (1978) 85 Cal.App.3d 228 [149 Cal.Rptr. 223], another spousal coverage case, the policy covered the spouse of the

insured, " '. . . if a resident of the same household.' " (*Id.* at p. 231.) At the time of the accident, the couple were in the midst of a trial separation and the husband was living at an apartment, while the wife remained in the family home. The husband was paying the wife's living costs, and received mail at the home address. The court found that the husband was still a resident of the same household as the wife, despite the physical separation. The court indicated that if the insurer did not wish to cover physically separated spouses, it should make that purpose clear in the policy.[5] Despite the footnote in *Apps* regarding the couple's intent to reunite, the deciding factors in the case were the more objectively observable indicators of residence such as mail delivery and payment of expenses.

In this case, Lamb ate, slept, and kept her belongings at Mitroff's house. She had no other address, and no evidence was produced which indicated she had any other residence. Lamb and Mitroff shared the common areas of the house and Mitroff contributed to Lamb's support. She was protected from the elements, received her sustenance, housed her personal items, bathed and slept at that house and no other. In short, they were still legally married, and still physically residing in the marital home at the time of the injuries to Lamb, under the same roof, sharing all the rooms except their bedrooms. The Enchanted Way residence was their household in October of 1993. By including Mitroff's spouse as an insured, USAA's policy provided coverage for Lamb for a number of harms. However, the USAA policy unambiguously excluded coverage for bodily injury to the spouse of an insured who was a resident of the same household.[6] The history of Mitroff and Lamb's relationship demonstrates the problems that would be raised by coupling the definition of a household to the changing subjective intent of a married couple. In light of the stormy nature of this couple's relations, such a conclusion would mean that USAA's duty to defend could change on a daily basis. The USAA policy includes no special dispensation for spouses in a dysfunctional household, and we will not construct one.

In the most basic dictionary meaning, "a resident of the same household is one, other than a temporary or transient visitor, who lives together with

[5]The court noted that it was not addressing the issue of a husband and wife who separated without "intention or hope of resuming a normal married life." (*Reserve Insurance Co.* v. *Apps, supra,* 85 Cal.App.3d at p. 231, fn. 2.) Mitroff argues that the final judgment of dissolution of his marriage evidences that he and Lamb had no intention of reuniting. Even if such intent is determinative, neither Mitroff nor Lamb had abandoned their marital home at the time of the questioned events and the dissolution occurred later.

[6]We decline to apply provisions of the Family Code regarding the date of separation and its impact on earnings and liabilities to determine whether spouses are residents of the same household for insurance purposes. (*Dalton* v. *Metropolitan Property & Liability Ins. Co.,* *supra,* 136 Cal.App.3d 1037, 1041.)

others in the same house for a period of some duration . . . ." (*Hardware Mutual Casualty Co.* v. *Home Indemnity Co.* (1966) 241 Cal.App.2d 303, 311 [50 Cal.Rptr. 508].) We do not disagree with the holding or definition set out in *Jacobs* v. *Fire Ins. Exchange, supra,* 227 Cal.App.3d 584. The *Jacobs* court was broadly construing a coverage provision in a case where the tortfeasor neither lived with nor was related to, the insured. We merely find that subjective considerations of spousal intent and harmony (or lack thereof) carry little weight in the determination of this contractual insurance coverage issue. Failure to share the marital bed or engage in congenial conjugal conversation are not dispositive factors when more salient facts are present. The facts available to USAA indicated that Lamb and Mitroff were members of the same household.

We reject Mitroff's assertion that USAA is required to defend him because Lamb's complaint alleged that Mitroff had been physically and verbally abusive "throughout the twelve (12) year relationship," and the parties were not married for the entire 12-year period. There were no facts produced regarding any incidents that took place when Mitroff and Lamb were not married. All the information available to USAA pertained to the two October incidents in 1993, including information furnished by the appellant during investigation of the claim. Those two incidents were the only specific incidents alleged in the complaint. The complaint requests punitive damages, and we conclude that the allegations regarding 12 years of abuse are merely the pleading of "aggravating circumstances," intended only to enhance the monetary amount of damages. (*Oppenheimer* v. *City of Los Angeles* (1951) 104 Cal.App.2d 551, 553 [232 P.2d 30].)

Finally, we reject the contention that the trial court was compelled to take judicial notice of court records in two unrelated matters in which Mitroff argued that USAA took a different position as to coverage of similar matters. Evidence Code section 453, which states that the court shall take judicial notice of matters properly presented does not compel the court to admit irrelevant matters that would result in the undue consumption of time. Mitroff has cited no authority which would require such an outcome. The likelihood that the court would have to make a detailed inquiry into the facts and contentions of the parties in each of the other cases supports the court's denial of the request for judicial notice. (Evid. Code, § 352.)

Moreover, because our focus was on the unambiguous language of the exclusion and the intent of the parties at the time the policy was entered into, evidence from other litigation is irrelevant. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807, 823, fn. 9.)

## CONCLUSION

The trial court did not err in granting summary judgment. The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 1, 1999.