106 Cal.Rptr.2d 341 (2001)
88 Cal.App.4th 876
HENKEL CORPORATION, Plaintiff and Appellant,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY, et al. Defendants and Respondents.
No. B134742.
Court of Appeal, Second District, Division Three.
April 30, 2001.
Review Granted July 18, 2001.
*343 Bergman, Wedner & Dacey, Inc., Gregory M. Bergman and Robert M. Mason III, Los Angeles, for Plaintiff and Appellant.
Kelley, Drye & Warren, Cynthia S. Papsdorf, Los Angeles, William C. Heck and Sarah L. Reid, New York, NY, for Defendant and Respondent Rhone-Poulenc, Inc.
Hogan & Hartson, Robert E. Postawko and Patrick F. Hofer, Wash. Dist. of Columbia, for Defendant and Respondent Hartford Accident and Indemnity Company.
Berman & Aiwasian and Alan S. Berman, Los Angeles, for Defendant and Respondent Century Indemnity Company.
Mendes & Mount and Charles Carluccio, Los Angeles, for Defendant and Respondent Lloyd's of London.
*342 CROSKEY, J.
This case arises out of the Lockheed mass tort litigation in which employees of Lockheed sought recovery for bodily injuries caused by exposure to toxic chemical products during the course of their employment (hereafter, the Lockheed litigation). Joined as defendants in this litigation *344 were a number of companies which had supplied such chemical products to Lockheed. In the matter before us, a successor corporation which had been sued for such bodily injuries allegedly arising from the predecessor corporation's chemical products business, seeks defense and indemnity benefits under the predecessor's liability insurance policies. Under circumstances where the predecessor effectively ceased to exist, the successor corporation had acquired all of the assets of the predecessor and had expressly assumed all of its liabilities; however, the predecessor's insurance policies had not been assigned to the successor.[1]
We are presented with the question as to whether the successor corporation is nonetheless entitled to the policy benefits of defense and indemnity as to those claims arising from bodily injuries that allegedly occurred prior to the transfer of the business to the successor. As we explain, under those circumstances, the successor is entitled, by operation of law, to claim such policy benefits. To hold otherwise would provide an unfair windfall to the insurers that had expressly underwritten these particular risks and had received premiums therefore; permitting the successor to receive the promised policy benefits would not increase the risk to any insurer and would be consistent with the objectively reasonable expectations of all parties.
The plaintiff and appellant, Henkel Corporation (Henkel), is the successor described above and it has appealed from a summary judgment on its complaint for declaratory relief granted in favor of the defendants and respondents, Hartford Accident and Indemnity Company (Hartford) and Century Indemnity Company (Century; collectively, the Insurers). The Insurers had provided, through issuance of multiple policies, liability insurance to Henkel's predecessor during the period 1959 to 1976 when the claimants in the Lockheed litigation claimed to have suffered bodily injury from exposure to the predecessor's chemical products. By its action, Henkel sought to recoup some portion of the sums it had expended to defend and settle the Lockheed litigation. The Insurers had denied coverage and refused a defense on the ground that Henkel was not an insured under any of the policies and that, in fact, a different corporation had succeeded to the assets of the predecessor not acquired by Henkel and that corporation was the only party entitled to assert a claim for policy benefits. That other corporation was the defendant and respondent Rhone-Poulenc, Inc. (Rhone), which had also been named in Henkel's declaratory relief complaint. The trial court agreed with the claim that Rhone was the party that had succeeded to the ownership of the Insurers' policies; therefore, Rhone's motion for summary judgment on Henkel's complaint was also granted and is before us in this appeal.
Because we conclude that ownership of the policies is not relevant to Henkel's right to receive policy benefits for claims arising, and as to which a basis for coverage under the Insurers' policies had existed, prior to the transfer of the predecessor's business, we will reverse the summary judgments granted in favor of the Insurers and Rhone. That does not mean, however, that Henkel is thereby entitled to succeed on its recoupment claim. Contrary to the views of the parties and the trial court, we perceive a number of triable issues of material fact remaining to be resolved. All that we decide now is the predicate *345 legal issue that, under the circumstances presented in this case, coverage must follow liability. The right to call upon policies of insurance covering claims which have accrued prior to the transfer of the predecessor's business will devolve, absent an express agreement to the contrary, by operation of law upon the successor which has assumed the liabilities of the predecessor. In reaching this result, we distinguish or reject the two California appellate decisions upon which the Insurers and Rhone rely.

FACTUAL AND PROCEDURAL BACKGROUND[2]
For a number of years prior to 1977, Amchem Products, Inc., a Pennsylvania Corporation (Amchem No. I),[3] was engaged in the manufacture and sale of chemical products. It engaged in two separate distinct lines of business: (1) metal working chemical products and (2) agricultural chemical products. During a substantial portion of the period 1959 through 1976, Amchem No. 1 carried liability insurance with the Insurers.[4]
In 1977, Amchem No. 1 was merged into UCAR Corporation, a wholly owned subsidiary of Union Carbide Corporation which had purchased all of the stock of Amchem No. 1. UCAR Corporation then changed its name to Amchem Products, Inc. (and remained a Pennsylvania Corporation). For convenience, we continue to refer to this corporate entity as Amchem No. 1 as, for our purposes, it is still the same corporation.
This all changed, effective April 1, 1979, when Amchem No. 1 decided to reorganize its business and caused a new corporation to be formed under Delaware law, also known as Amchem Products, Inc. This corporation was a wholly owned subsidiary of Amchem No. 1 and is hereafter referred to as Amchem No. 2.[5] Amchem No. 1 caused all of the assets, liabilities and goodwill utilized in its metal working chemical products business to be transferred to Amchem No. 2, while Amchem No. 1 retained all of the assets and liabilities which existed with respect to the agricultural chemical products business. While Amchem No. 2 assumed all of the liabilities relating to the metal working chemical products business which existed as of April 1, 1979, the several policies of insurance which had theretofore been issued to Amchem No. 1 by the Insurers were not assigned to Amchem No. 2.[6] The reason for this, according *346 to the declaration of counsel for Amchem No. 1, who handled this corporate reorganization, was that the insurance policies had been issued to Amchem No. 1 and were "not assets related to the metalworking chemicals business."[7]
Although counsel for the Insurers and Rhone assert that Amchem No. 2 expressly assumed "all liabilities" of Amchem No. 1 "utilized in its metal working chemical activities," the only evidence of such assumption cited to us is the resolution of Amchem No. 2's board of directors, dated March 30, 1979. That resolution provided: "the transfer, conveyance and assignment effective April 1, 1979 from [Amchem No. 1] to [Amchem No. 2] of all of the right title and interest of [Amchem No. 1] in and to the domestic assets, liabilities and goodwill utilized in its metalworking chemical activities ... be and the same is hereby accepted...." The generality of such language causes the transaction's documentation to be ambiguous as to whether claims for bodily injury or property damage, arising from Amchem No. 1's metal working chemical products business, which existed as of April 1, 1979, but had not then been asserted, could be considered claims for which insurance coverage existed and thus part of the "assets" transferred to Amchem No. 2; or were they simply liabilities for which Amchem No. 2 had accepted sole responsibility and for which it had implicitly waived any claim to coverage under the policies issued by the Insurers.[8] Such general language does not expressly preclude coverage for unknown and unasserted claims which existed as of the date of transfer. If there is additional undisputed evidence of the parties' intent on this issue it is not disclosed by this record.
Ultimately, through various corporate mergers and transfers, Amchem No. 2 became a wholly owned subsidiary of Henkel and, in December of 1988, it was merged into Henkel. Similarly, Amchem No. 1 was ultimately sold to Rhone and, effective December 31, 1992, was merged into it. Thus, this record presents an undisputed factual picture of Henkel succeeding to all of the rights and obligations of Amchem No. 2 and Rhone to all of the rights and obligations of Amchem No. I.[9]
In approximately 1989, the first of the civil actions for wrongful death and personal injury constituting the Lockheed litigation was filed. Henkel and "Amchem Products, Inc." were ultimately named as defendants in this litigation. These actions were filed on behalf of more than 600 current or former employees of the Lockheed Corporation (Lockheed), or one of its subsidiaries or divisions. In these complaints, *347 it was alleged that the plaintiffs (or their decedents) suffered injury (or death) as the result of working with toxic chemical substances in the course of their employment by Lockheed. These several civil actions constituting the Lockheed litigation were ultimately coordinated in the Los Angeles Superior Court as Judicial Council Coordination Proceeding No. 2967 (JCCP No. 2967).
The plaintiffs in the Lockheed litigation alleged claims asserting manufacturing and design defects, failure to warn and negligence and claimed that their exposure to such hazardous chemicals (for which they received neither warning nor protection) took place over a period of years commencing in the "1950s and continuously thereafter." Among the toxic chemicals to which the plaintiffs claimed they were exposed were products manufactured by Amchem No. 1 prior to April 1, 1979 in connection with its metal working chemical product business and by Amchem No. 2 after that date. After its acquisition of the stock of Amchem No. 2, Henkel continued in this business.[10]
Following service upon it of the complaints in the Lockheed litigation, Henkel tendered them to the Insurers and they each denied coverage and refused a defense.[11] The Insurers took the position that Henkel was not entitled to coverage as it was not an insured party nor was it entitled, by virtue of its acquisition of Amchem No. 2, to claim such coverage. Henkel therefore undertook at its own expense the defense of the litigation. In the summer of 1995, it commenced settlement discussions with the Lockheed plaintiffs. A demand was made by those plaintiffs for $11 million. Henkel notified the Insurers of the negotiations and of this offer; it requested that the Insurers contribute their policy limits in order to effect a settlement. They refused to make any contribution to a settlement. After several months of further negotiation with the Lockheed plaintiffs, Henkel agreed to settle with them for the sum of $7,650,000 which it paid in exchange for a release and a dismissal of all of the actions with prejudice. Agreement on the settlement terms was reached on November 28, 1995 and a dismissal of the entire action with prejudice was filed and entered on July 19, 1996 "as to defendants Henkel Corporation and Amchem Products, Inc."
Henkel then sought to recoup from the Insurers their allocable portion[12] of the settlement and defense costs. The Insurers refused to negotiate any resolution of Henkel's recoupment claims. As a result, Henkel filed this action for declaratory relief on August 7, 1996. As already noted, the Insurers took the position that *348 Henkel was not an insured party (nor an assignee or successor to one) and therefore they owed no obligation to provide either defense or indemnity for any claims asserted against Henkel or an entity identified as "Amchem Products, Inc." It was and is the Insurers' position that the only party entitled to claim coverage under the liability policies issued by them in the name of "Amchem Products, Inc." during the 1959-1976 period is Rhone. It is that corporation, they contend, which is the proper successor to Amchem No. 1 and is thus the actual insured party. In order to fully litigate that contention, the Insurers caused Rhone to be added as a necessary party to this action on October 14, 1997.
Thereafter, Rhone filed a cross-complaint against Henkel for declaratory relief claiming it was the corporate successor of Amchem No. 1 and that Henkel was not entitled to coverage under any of the Insurers' policies. It was and is Rhone's position that those policies were not among the assets "relating to the metal working chemical products" business which had been assigned to Amchem No. 2 on April 1, 1979. Such policies instead were retained by Amchem No. 1 and thus it was the only proper insured who could assert a claim thereunder. Rhone argues that, since it is the corporate successor of Amchem No. 1, it is entitled to a judgment declaring that Henkel has no viable claim for coverage under the policies issued by the Insurers during the 1959-1976 time period.
In light of such argument, it is necessary at this point to digress to a critical procedural event which took place during the underlying Lockheed litigation. In early 1992, the plaintiffs in that litigation had served on Rhone a summons and complaint which named "Amchem Products, Inc." as a defendant. Rhone promptly moved to quash such service on several grounds. One of those grounds was that the named defendant, Amchem Products, Inc., "was in no way a part of [Rhone] or any [Rhone] entity." Rhone argued that since neither Rhone nor any Rhone entity had been listed on the summons, service on Rhone should be quashed.
In support of this motion, an in-house counsel employed by Rhone, Barbara A. Moore, submitted a declaration under penalty of perjury in which she stated that she acted as litigation counsel for Rhone and all of that companies' subsidiaries. She further stated that she had "personal knowledge of all of the facts" set out in her declaration. Ms. Moore then stated: "To the best of my information and belief, Amchem Products, Inc. no longer exists. If it does exist, it certainly is not in any way a part of [Rhone] or any [Rhone] entity. It may be a part of a completely unrelated corporation named Henkel Corporation which is already a defendant in this litigation." (Italics added.)
Before its motion to quash could be ruled upon, Rhone negotiated directly with the Lockheed plaintiffs for a stipulation that its motion could be granted. That stipulation, to which Rhone was a party, provided in part: "Plaintiffs have conducted further investigation, since April 13, [1992] of [Rhone's] potential involvement in the Lockheed Consolidated Cases, and have been presented with documents establishing that Henkel Corporation is answerable for the liabilities of Amchem Products, Inc. alleged in the Lockheed Consolidated Cases. Accordingly, plaintiffs have no interest in asserting their claims against [Rhone]." In sum, it would appear that Rhone was dropped from the Lockheed litigation on the ground that the entity responsible for the production and sale of the alleged toxic chemicals no longer existed as it had been merged into Henkel. This fact is relevant to our later *349 discussion of Henkel's claim that it is entitled to coverage under the Insurers' policies for the claims arising from the pretransfer injuries to the Lockheed plaintiffs and that Rhone is now judicially estopped to contest that proposition.
In September 1998, Henkel filed a motion for summary judgment claiming that as the corporate successor of the entity that had manufactured the toxic chemicals that were the subject of the Lockheed litigation, it was entitled to the benefit of the liability policies that had been purchased to provide liability coverage for such manufacturing activity. Since Henkel had defended and settled all of those claims, it asserted that it was entitled to obtain recoupment from the Insurers. In October 1998, the Insurers and Rhone filed cross-motions for summary judgment.
On January 15, 1999, these competing motions came before the trial court. It concluded that there were no disputed issues of material fact and held that the Insurers and Rhone were entitled to judgment. It rejected Henkel's arguments that, as the successor to the metal-working product business attacked in the Lockheed litigation, it was entitled to the benefit of liability insurance issued to cover such business.[13] The court also rejected Henkel's "defacto merger" contention. It did so, as stated by the trial court, because that doctrine did not apply in this case since Amchem No. 1, the company that had sold off the offending business, "continued to exist" and, in any event, a claimant is free to pursue the successor company, Amchem No, 2. In the trial court's view, the continued existence of Amchem No. 1 and the Lockheed plaintiffs naming of Henkel and "Amchem Products, Inc." as defendants was sufficient to avoid application of the "defacto merger" doctrine. Finally, the court also rejected Henkel's fall back position that if no insurance coverage was available then Rhone was liable to equally share Henkel's settlement and defense costs in the Lockheed litigation.
Judgment was entered against Henkel on July 13, 1999 and this timely appeal followed.

ISSUE PRESENTED
The fundamental question before us is whether Henkel, under the facts presented in this case, has standing to claim the benefit of coverage under the liability policies issued by the Insurers to Amchem No. 1 during the time period 1959-1976 so as to recoup the settlement and defense costs which it incurred to dispose of the claims that arose from the business activities of Amchem No. 1 during that period. To resolve that question we must examine the proper application of the principle that coverage should follow liability.

DISCUSSION

1. Standard of Review

The matter comes to us after the trial court granted motions for summary judgment. Such motions are to expedite litigation and eliminate needless trials. (Hood v. Superior Court (1995) 33 Cal.App.4th 319, 323, 39 Cal.Rptr.2d 296.) They are *350 granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); KOVR-TV, Inc. v. Superior Court (1995) 31 Cal.App.4th 1023, 1027-1028, 37 Cal. Rptr.2d 431.) A defendant meets its burden upon such a motion if it proves "one or more elements of the cause of action, ... cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o)(2).) Once a defendant or cross-defendant has met that burden, the "burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists...." (Ibid.; Union Bank v. Superior Court (1995) 31 Cal.App.4th 573, 583, 37 Cal.Rptr.2d 653.) If a defendant does not meet its burden then the motion must be denied.
On appeal, we exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court...." (Iverson v. Muroc Unified School Dist. (1995) 32 Cal. App.4th 218, 222, 38 Cal.Rptr.2d 35; Union Bank v. Superior Court, supra, 31 Cal.App.4th at p. 579, 37 Cal.Rptr.2d 653.) "[W]e construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it. [Citation.]" (Szadolci v. Hollywood Park Operating Co. (1993) 14 Cal.App.4th 16, 19, 17 Cal. Rptr.2d 356; accord, Lorenzen-Hughes v. MacElhenny, Levy & Co. (1994) 24 Cal. App.4th 1684, 1686-1687, 30 Cal.Rptr.2d 210.)

2. The Trigger of Coverage Under An Occurrence Liability Policy
Critical to our analysis is an understanding of the basic principles of insurance law governing a determination of whether a particular third party claim may be covered by a particular liability policy. What is necessary to trigger coverage under a specific policy?
The term "trigger of coverage" is not found in a general liability policy. Rather, it is a term of convenience which is used to describe what operative event must happen during the policy period to activate the insurer's defense and indemnity obligations. As the Supreme Court has put it, "[t]he issue is largely one of timingwhat must take place within the policy's effective dates for the potential of coverage to be `triggered'?" (Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 655, fn. 2, 42 Cal.Rptr.2d 324, 913 P.2d 878; emphasis in original (Montrose).)
In an "occurrence-based" liability policy, such as those issued by the Insurers in this matter, coverage is established at the time the complaining party was actually damaged. (Id. at pp. 669-670, 42 Cal.Rptr.2d 324, 913 P.2d 878.) To put it another way, coverage under a liability policy, promising to indemnify the insured for all sums it may become legally obligated to pay as damages because of bodily injury or property damage, is triggered when the bodily injury or property damage occurs, irrespective of when the insured's allegedly wrongful conduct may have taken place. If that injury or damage occurs during the policy period, then coverage under the policy is triggered provided the accident or condition is at least a potentially covered risk. (Id. at p. 675, 42 Cal. Rptr.2d 324, 913 P.2d 878.)
Thus, if the insured's wrongful conductin this case, the manufacture and sale of toxic chemicals without proper warningsoccurs during the policy period, but injury or damage to a claimant does not occur until after the policy has expired, there can be no coverage because the operative *351 event necessary to trigger that coverage did not occur during the policy period. (State Farm Mut. Auto. Ins. Co. v. Longden (1987) 197 Cal.App.3d 226, 232, 242 Cal.Rptr. 726 [the insured's allegedly negligent failure to maintain the brakes on an automobile caused a brake failure and resulting accident after the policy expired; no coverage available as required coverage trigger (i.e., the injuries caused by the accident) did not occur during policy period]; Schrillo Co. v. Hartford Accident & Indemnity Co. (1986) 181 Cal.App.3d 766, 773, 226 Cal.Rptr. 717 [a product liability policy in effect when defective product was manufactured did not cover claim for injuries suffered several years later]; Maples v. Aetna Cas. & Surety Co. (1978) 83 Cal. App.3d 641, 647, 148 Cal.Rptr. 80 [a gas boiler installed by contractor caused fire damage to home six years later; the owner's claim for damages was not covered under contractor's liability policy in effect at time of allegedly negligent installation].)
In continuous injury cases, such as we appear to have here, where the insured's actions result in claims of continuing or progressively deteriorating bodily injury or property damage, a similar rule is applied. Such cases usually implicate, as they do here, multiple and successive policies and policy periods. In such cases, "bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (Montrose, supra, 10 Cal.4th at p. 689, 42 Cal.Rptr.2d 324, 913 P.2d 878.) "In other words, if specified harm is caused by an included occurrence and results, at least in part, within the policy period, it perdures to all points of time at which some such harm results thereafter." (Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 57, 70 Cal.Rptr.2d 118, 948 P.2d 909, fn. omitted, (Aerojet).)
Thus, where damages continue throughout successive policy periods, all insurance policies in effect during those periods, are triggered. Coverage is not limited to the policy in effect at the time of the precipitating event or condition. Nor is coverage cut off once the injury or damage begins or becomes manifest. (Montrose, supra, 10 Cal.4th at pp. 677, fn. 17, 685-689, 42 Cal.Rptr.2d 324, 913 P.2d 878.) Thus, although the trigger of the duty to defend and indemnify is limited to the policy period, the extent of that duty is not. As a result, any "triggered" policy is liable up to the policy limit, for all injuries or damages caused by a covered occurrence, not just the injury or damage which took place during the specific policy period. (Aerojet, supra, 17 Cal.4th at pp. 56-57, 70 Cal.Rptr.2d 118, 948 P.2d 909.)
When we apply these settled legal principles to this case, it would appear that a basis for coverage under the several policies issued by the Insurers during the 1959-1976 time period, for claims arising from injuries to the Lockheed plaintiffs occurring during such policy periods, is established by the occurrence of such injuries. As a result, the Insurers owe a duty of defense and indemnification under those policies to somebody upon the assertion of such claims.[14] This is a fundamental point *352 which is critical to the proper resolution of this case. According to the allegations of the Lockheed plaintiffs, they sustained bodily injuries during the 1959-1976 period due to exposure to the chemical products of Amchem No. 1. Whether or not asserted during the policy periods (i.e., 1959-1976), the claims of the Lockheed plaintiffs constituted claims for which the Insurers had been paid an agreed premium to defend and indemnify. Henkel, therefore, is seeking nothing more than the enforcement of an obligation already undertaken by the Insurers. Nothing Henkel seeks to do will increase any risk to the Insurers which they have not already agreed to assume and for which they were paid a premium.
The only question before us then is whether Henkel is entitled to assert that claim. We now turn to that issue.

3. Henkel Is Entitled To Coverage Under The Insurers' Policies For Claims Existing As Of April 1, 1979, Whether Or Not Asserted a. There Was No Expressed Intent To Deny Coverage Under The Policies For Unasserted Pre-Sale Claims

On April 1, 1979, Amchem No. 2 succeeded to all of the assets and liabilities of Amchem No. 1 which related to the metal working chemical products business. Did this include, in the absence of a contrary agreement, the right to coverage under existing applicable policies for those claims for injuries which existed as of that date, even though such claims had not yet been asserted? We believe the answer to that question is yes. It is settled that the right to recover under a policy after a loss has occurred is an asset assignable separate from the policy itself. (Greco v. Oregon Mut. Fire Ins. Co. (1961) 191 Cal. App.2d 674, 682, 12 Cal.Rptr. 802.) Thus, it can be assigned without insurer consent, the "no assignment" clause notwithstanding. (Ibid.) Such an assignment in no way interferes with the insurer's right to chose its own indemnitee but only involves the payment of a claim founded upon a loss which has already occurred and against which the policy indemnifies.[15] If it was the intent of Amchem No. 1 to retain the exclusive right to seek coverage under the Insurers' policies for any claims arising from the conduct of its metal working chemical products business prior to April 1, 1979, it is not directly or expressly reflected in the record presented to us.
Moreover, if Amchem No. 1 had any such intent on April 1, 1979, it is not only unsupported by any of the documentation of its divestiture of the metal working chemical products business to Amchem No. 2, it is also strongly contradicted by the position Rhone took when it was served with a summons and complaint in the Lockheed litigation. The documents that it filed to quash that service, as well as the stipulation it entered into with the Lockheed plaintiffs, makes it clear that as far as any business activity of Amchem No. 1 upon which the Lockheed plaintiffs might be basing their injury claims was concerned, the only surviving responsible entity was Amchem No. 2. If it was Amchem No. 1's position that it was not a proper party to the Lockheed litigation, then that assertion is very probative of its intent and understanding of the terms of its divestiture of the business to Amchem No. 2 in 1979. Obviously, if it is the case that after April 1, 1979, Amchem No. 1 was to have no responsibility for any claims arising from the metal working *353 chemical products business, and could not properly be sued thereon, then it had no need for reliance on the insurance coverage available for such claims. Further, if the Insurers, having been paid a premium to cover the very claims asserted against Henkel, owe coverage of those claims to somebody, then does it not follow that Henkel is the only party rightfully entitled to claim such coverage?[16]

b. Henkel, As The Successor Corporation Liable On The Claims Of The Lockheed Plaintiffs, Is Entitled To Coverage Under The Insurer's Policies By Operation of Law

Under the facts of this case, where Amchem No. 2 acquired all of the assets and liabilities of Amchem No. 1 as to the metal working chemical products business which is the source of the Lockheed litigation, the benefits due under the Insurers' policies, including the right to a defense of the claims asserted by the Lockheed plaintiffs, passed to Amchem No. 2 by operation of law.
This is so because as of April 1, 1979, Amchem No. 2 expressly agreed to accept all of the "assets, liabilities and goodwill" utilized by Amchem No. 1 in its metal working chemical business and, based on the record before us, we cannot conclude that its right to call upon insurance available to cover those liabilities was excluded from the purchase and sale transaction. It appears to us that, absent a contrary agreement as to the availability of such liability insurance, the principles articulated in Northern Ins. Co. of New York v. Allied Mut. Ins. Co. (9th Cir.1992) 955 F.2d 1353 (Northern.) apply.
In Northern, the court held, in a factual context very similar to that before us, that the benefits due under the policy transferred by operation of law. In that case, Brown Forman bought out California Cooler under an agreement where the predecessor company would indemnify the successor company for any liabilities arising from presale activities.[17] A child born before the sale filed suit after the sale alleging fetal alcohol syndrome attributable to the California Coolers his mother consumed during her pregnancy. This suit ended in a voluntary dismissal, but the issue remained as to whether the predecessor's insurer had any liability to contribute to defense costs. As in our case, the insurer's policy had not been assigned to the successor corporation; indeed, it had been expressly excluded from the list of assets transferred to Brown-Forman.
Nonetheless, the Northern court concluded that Brown-Forman was entitled to the coverage benefits due under the policy. It held that neither the sales agreement between the predecessor and successor corporations, nor the intent of these parties, nor the terms of the predecessor corporation's contract with its insurance company *354 ultimately controlled.[18] Instead, the benefits due under the policy passed to Brown-Foreman by operation of law. Since the doctrine of "successor liability" transferred the liability from the predecessor to the successor corporation, the right to indemnity followed as well. "[T]he right to indemnity arising from [the predecessor corporation's insurance] policy transferred together with the potential liability. This right to indemnity followed the liability rather than the policy itself As a result, even though the parties did not assign [the predecessor corporation's insurer's] policy in the agreement, the right to indemnity under the policy transferred to [the successor corporation] by operation of law." (Id. at p. 1357; italics added.)
The court also concluded that these policy benefits extended to a defense. The rationale for both conclusions rested upon the obvious fact that the insurer is not prejudiced by such a result when the loss occurred before sale or transfer to the successor. In that circumstance, "the characteristics of the successor are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy.... [¶] .... [¶] The nature of the risk, rather than the particular characteristics of the defendant, will have the greater effect on defense costs. The extent and character of the defense will turn on the nature of the product itself and the attributes of the firm that manufactured the product. Aspects of the successor firm could affect the defense, but the shape of the defense will be determined largely by the characteristics of the risk originally insured. Admittedly, defense costs could balloon if the successor firm failed to cooperate in the defense. Inasmuch as the successor firm was not a party to the original policy, the risk of noncooperation arguably increases. Yet, the insurer is protected against this risk because it is freed of its defense obligation if the successor firm does not fulfill its duty to aid in the defense." (Id. at p. 1358.)
We believe that Northern articulates the correct analysis in those successor corporation cases where the loss has already occurred but a claim is not asserted until after the transfer to the successor. Its reasoning has been followed by a number of courts. For example, in B.S.B. Diversified Co. Inc. v. American Motorists Ins. (W.D.Wash.1996) 947 F.Supp. 1476, the court followed Northern and concluded that coverage followed liability by operation of law. In a case much like the one before us, the successor corporation in B.S.B. had assumed the predecessor's assets and liabilities by contract. The B.S.B. court held that the underlying principle that insurance follows liability is equally valid even though the successor's liability burden was imposed by contract rather than under successor product liability rules. (Id. at p. 1481.) This is so because an insurer's risks are not increased when its duty to defend and indemnity relates to events occurring prior to the transfer. (Ibid.) "Coverage will depend on the terms *355 of each policy, but the damage to the property is the same regardless." (Ibid.; see also Total Waste Management v. Commercial Union Ins. Co. (D.N.H.1994) 857 F.Supp. 140, 152 ["An insurer's risk does not increase where the loss or liability arose prior to the transfer."].)
The only two California cases which have considered this issue, however, appear at first glance to reach a different conclusion than Northern. Unsurprisingly, these two cases are the ones which the Insurers and Rhone urge upon us. Neither are persuasive.
In Quemetco Inc. v. Pacific Automobile Ins. Co. (1994) 24 Cal.App.4th 494, 29 Cal. Rptr.2d 627 (Quemetco), the successor corporation purchased all of the assets of the predecessor in 1970. The predecessor had in 1957, and again in 1960-1964, shipped sulfuric acid waste and battery electrolytes to the Stringfellow acid pits in Riverside County. No deposits were ever made by the successor. The predecessor's insurance policies were not assigned to the successor; the predecessor distributed all of its assets and wound up and dissolved in January 1971. The successor was then sued in 1982 in both federal and state court actions. The federal case was filed under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and sought damages for environmental exposure as well as cleanup costs. The state case was an action by 5,000 individual plaintiffs for personal injury and property damages allegedly caused by the hazardous waste material deposited at the Stringfellow site.[19]
Relying on the Northern case, the successor filed an action for declaratory relief to determine its entitlement to coverage under the predecessor's insurance policies. The Quemetco court, however, refused to follow Northern on the ground that the CERCLA case before it did not present similar circumstances. Unlike the facts in Northern, and those in the case before us, Quemetco involved a claim which arose long after the sale when federal environmental laws were enacted requiring the clean up of toxic waste sites. "Thus, unlike the situation in Northern, no liability passed as a matter of law [to the successor] at the time of the asset sale as no such liability existed at that time." (Quemetco, supra, 24 Cal.App.4th 494, 501, 29 Cal.Rptr.2d 627; italics added.) The court also rejected, for the same reason, the proposition that there could have been any assignment of the proceeds of the policies "as there was no loss or injury or accrued right to collect the proceeds in existence. The cleanup damages were not assessed until 1987, long after the 1970 sale." (Id. at pp. 502-503, 29 Cal.Rptr.2d 627.) Finally, the Quemetco court also noted that the predecessor corporation, although dissolved, could still be sued and was entitled to a defense from its insurers. (Id. at p. 503, 29 Cal.Rptr.2d 627.) Thus, any recognition of policy benefits in favor of the successor would have placed an increased risk and burden on the insurers requiring them to provide a defense for two parties, only one of which they had agreed to insure. (Id.) This, of course, is not a problem in this case, as Rhone's actions to end its participation in the Lockheed litigation clearly demonstrated. It obtained a dismissal from that action upon the representation (and ultimately by a stipulation) that it had no liability whatsoever for the claims asserted against Henkel. Thus, the Quemetco decision is factually distinguishable and cannot justify our *356 rejection of the analysis and reasoning of Northern.[20]
The other case relied by the Insurers and Rhone is General Accident Ins. Co. v. Superior Court, supra, 55 Cal.App.4th 1444, 64 Cal.Rptr.2d 781 (General Accident). In that case, the successor took over the predecessor in about 1967 under circumstances which resulted in a later judicial determination, under the "successor liability" doctrine (Ray v. Alad Corp. (1977) 19 Cal.3d 22, 31, 136 Cal.Rptr. 574, 560 P.2d 3), that the successor corporation was liable for the tortious claims arising from the predecessor's business which involved the manufacture and sale of asbestos products. (General Accident, supra, 55 Cal.App.4th at pp. 1446-1447, 64 Cal. Rptr.2d 781.) The successor sued the predecessor's insurers for a declaratory judgment that the predecessor's insurance policies had been transferred to the successor by operation of law. (Id. at p. 1445, 64 Gal.Rptr.2d 781.) The successor relied upon the Northern decision. (Id. at p. 1449, 64 Cal.Rptr.2d 781.)
The General Accident court rejected the reasoning of Northern and refused to follow it. (General Accident, supra, 55 Cal. App.4th at p. 1449, 64 Cal.Rptr.2d 781.) Specifically, it refused to conclude that insurance coverage would transfer by operation of law simply based on the finding of successor liability for product liability torts. "An insured-insurer relationship is a matter of contract. Successor liability is a matter of tort duty and liability. It is one thing to deem the successor corporation liable for the predecessor's torts; it is *357 quite another to deem the successor corporation a party to insurance contracts it never signed, and for which it never paid a premium, and to deem the insurer to be in a contractual relationship with a stranger." (Id. at p. 1451, 64 Cal.Rptr.2d 781.) The court concluded that any transfer of a policy by operation of law was "a violation of the basic principles of contract and is also bad public policy." (Id. at p. 1454, 64 Cal.Rptr.2d 781.)[21] With all due respect to our colleagues in the First District, we must question just what conclusion we are to draw from the General Accident decision. If it stands for the proposition that the imposition of successor tort liability cannot by itself justify the transfer of an interest in a policy of insurance by, in effect, adding (or substituting) a new insured to which the insurer has not consented, and thereby creating additional unbargained for and uncompensated risks, then we have no problem with it. Such a conclusion would clearly violate fundamental contract law. If, however, as the Insurers and Rhone argue, General Accident stands for the proposition that the right to obtain policy benefits for the defense and indemnification of claimed losses which had occurred during the policy period prior to the sale or transfer to a successor corporation, then we must reject it. Northern did not purport to sanction what General Accident found so improper. It did not sanction the transfer of an insurance contract so as to create new unbargained for burdens or to impose upon an unwilling insurer a new insured whose activities *358 it had not agreed to underwrite. Rather, Northern simply affirmed a successor's right to call upon the policy benefits already due to the predecessor for unasserted claims which arose as the result of the occurrence of injury or damage during the policy period. In short, and in legal effect, it simply held that the right to claim such benefits was a right of the predecessor corporation to which the successor corporation succeeded by operation of law. Thus, the General Accident decision provides no relevant reason for rejecting the analysis made by the Northern court.

c. The "No Assignment" Clause In The Insurers' Policies Does Not Defeat Henkel's Coverage Claim

As we have already emphasized, the transfer of policy benefits which have effectively accrued impose no new or additional burden on an insurer. There is no increase in risk when an insurer's duty to defend and indemnify relates to injury or damage which was suffered by the claimant prior to the sale or transfer to the successor corporation. Thus, there is no reason to be concerned with the "no assignment" clause when the claims for which coverage is demanded arose prior to the sale or transfer.
As the Northern court put it, "Insurers take account of the nature of the insured when issuing a policy. Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter drastically the insurer's exposure depending on the nature of the new insured. `No assignment' clauses protect against any such unforeseen increase in risk. When the loss occurs before the transfer, however, the characteristics of the successor are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy." (Northern, supra, 955 F.2d at p. 1358; see also, Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co. (8th Cir.1939) 100 F.2d 441, 444-445, cert. denied, 306 U.S. 658, 59 S.Ct. 775, 83 L.Ed. 1056.)
Other than the overly broad and misdirected characterization in General Accident, we have found no California authority suggesting otherwise. However, a number of other courts have endorsed the basic principle articulated by Northern. (See e.g., Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co. (5th Cir.1976) 535 F.2d 287, 293 ["the no-assignment clause should not be applied ritualistically and mechanically to forfeit coverage in these circumstances"]; National American Insurance Co. v. Jamison Agency, Inc. (8th Cir.1974) 501 F.2d 1125,1128 [the purpose of a "no assignment" clause is "`to prevent an increase of risk and hazard of loss by change of ownership without the knowledge of the insurer.' [Citation.]"]; Brunswick Corp. v. St. Paul Fire & Marine Ins. Co. (E.D.Pa.1981) 509 F.Supp. 750, 753 ["The reason for refusing to apply a `no-assignment' clause to avoid an involuntary assignment is pragmatic: `such transfers do not entail any increase in the risk or hazard assumed by an insurer'."]; Paxton & Vierling Steel Co. v. Great American Insurance Co. (D.Neb.1980) 497 F.Supp. 573, 580 [same]; Gopher Oil Co. v. American Hardware Mut. Ins. Co. (Minn. Ct.App.1999) 588 N.W.2d 756, 763 ["The purpose of a non-assignment clause is to protect the insurer from an increase to the risk it has agreed to insure. [Citations.] But when events giving rise to an insurer's liability have already occurred, the insurer's risk is not increased by a change in the insured's identity. [Citation.]"].)
That such claim was unasserted as of the date of the sale or transfer to the successor corporation is not determinative. Coverage liability under a particular policy *359 is determined as the date of the claimant's loss or injury irrespective of when the claim is asserted. In this case, Amchem No. 1 would clearly have been entitled to the policy benefits prior to April 1, 1979, when it transferred all of the relevant assets to Amchem No. 2. Such benefits obviously related solely to the metal-working chemical products business which was the object of the transfer. Therefore, why should Henkel (as the successor to Amchem No. 2) not now be entitled to receive such benefits? As we discuss below, Rhone (as successor to the original named insured) is estopped to assert any claim to such benefits.
There is no reason to rely on the "no assignment" clause to defeat Henkel's claim of coverage. No new contractual burden is imposed on the Insurers; they need only defend a single party as to the very same claims which would have been asserted against the original named insured but for the circumstances of this case. The Insurers collected premiums to cover these very risks. If they are successful in defeating Henkel's claim to such policy benefits, the Insurers will realize an undeserved windfall as they would now owe no coverage to any party for a risk they promised to insure and for which they were paid an agreed premium.

4. Rhone Is Judicially Estopped To Assert That Extension Of Coverage To Henkel Will Increase Any Burden On Insurers Or Diminish Its Own Coverage For Claims Arising From PreSale Injuries, The Liability For Which Was Assumed By Amchem No. 2

As we have already discussed, Rhone was able to obtain a stipulated dismissal from the underlying Lockheed action on the representation which it formally asserted that there was no corporate responsibility for the claims made by the Lockheed plaintiffs other than that assumed by Amchem No. 2 (and Henkel). Rhone made it clear that no predecessor existed with respect to the pre-sale liabilities assumed by Amchem No. 2. Based on that representation, Rhone successfully extricated itself from the Lockheed litigation. It thus follows that it will have no occasion to call upon the Insurers to provide coverage for any of the claims relevant to this proceeding. If the Insurers are going to provide coverage to anyone for these claims (for which they were paid the requested premiums) they will have to provide it to Henkel. Rhone should not, in this action, be heard to argue otherwise.
Judicial estoppel is a well-recognized doctrine. (Thomas v. Gordon (2000) 85 Cal.App.4th 113, 117-118, 102 Cal. Rptr.2d 28.) It will be applied when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. [Citations.]" (Jackson v. County of Los Angeles (1997) 60 Cal.App.4th 171, 183, 70 Cal.Rptr.2d 96.) All of these elements are clearly satisfied here.
"`Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process.' [Citation.]" (Jackson v. County of Los Angeles, supra, 60 Cal. App.4th at p. 181, 70 Cal.Rptr.2d 96.) It is a doctrine that is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes will have an adverse impact on the judicial process. A litigant should not be permitted to play "fast and *360 loose" with the courts. (Ibid.) We believe the doctrine should be applied here to foreclose Rhone from asserting any argument premised on the fiction that any party other than Henkel would have any legitimate claim on coverage from the Insurers arising from the presale activities of Amchem No. 1 in the conduct of the metalworking chemical business sold to Amchem No. 2 on April 1,1979.

CONCLUSION
For all of these reasons, we conclude that Henkel is entitled to assert a claim for the policy benefits under the policies issued by the Insurers. In reaching this conclusion, however, we emphasize that it does not follow that the Insurers will necessarily have any obligation to reimburse Henkel for the defense and settlement costs which it expended to obtain a dismissal from the Lockheed litigation. We simply reverse the summary judgment granted on the competing claims to declaratory relief. It is our intent only to resolve in Henkel's favor the predicate legal question that Henkel is entitled to pursue the policy benefits due under the Insurers' policies for coverage of claims arising from bodily injuries suffered during the 1959-1976 period which were allegedly caused by exposure to the metal working chemical products manufactured and sold by Amchem No. 1 during said period. Absent an express agreement to the contrary (which is not established by the record before us), Henkel has standing to assert a claim to such policy benefits by operation of law, even though the policies themselves were never assigned or the Insurers' consent obtained.
It will still be Henkel's burden at trial, however, to produce evidence establishing a basis for potential coverage (duty to defend) or actual coverage (duty to indemnify) under the policies. There are also open questions as to the proper allocation of Henkel's defense costs and settlement expenses to claims arising under the Insurers' policy coverage and under other time periods for which different insurers may have some responsibility. Finally, as we have already suggested, we do not foreclose the possibility of a factual dispute as to the terms of the contract between Amchem No. 1 and Amchem No. 2 regarding the right to claim policy benefits under the Insurers' policies and whether Amchem No. 2 waived any of its rights with respect thereto. Rhone has made assertions regarding the nature and scope of such agreement that are not supported by the documents cited. However, other evidence may exist. These and any other relevant unresolved issues will have to be settled upon remand.[22]

DISPOSITION
The summary judgment entered on July 13, 1999, in favor of Rhone and the Insurers is reversed. The matter is remanded for further proceedings not inconsistent with the views expressed herein. Henkel shall recover its costs on appeal.
KLEIN, P.J., and ALDRICH, J., concur.
NOTES
[1] The policies contained "no assignment" clauses which precluded their assignment by the named insured without the consent of the insurer.
[2] The relevant facts (as opposed to their competing characterizations by the parties) are not in dispute and are clearly established by the record on appeal.
[3] Amchem No. 1 started life in 1914 as a Delaware corporation and through an acquisition and merger became a Pennsylvania corporation in 1968. Such corporate history, however, is irrelevant to the issues before us.
[4] During this period, Amchem No. 1 carried liability insurance with a number of insurers. According to the appellate record before us, however, coverage by the Insurers was as follows:

(1) Hartford: September 1959September 1962;
(2) Century: September 1962September 1965;
(3) Hartford: October 1971October 1975.
[5] Contemporaneously, Amchem No. 1 changed its name to Union Carbide Agricultural Products Company, Inc. (UCAPCO.); however, in the interests of clarity and simplicity, we will, continue to refer to this company as Amchem No. 1.
[6] Such policies contained a "no-assignment" clause which precluded any assignment of the policies themselves without the consent of the Insurers. It was expressly understood, however, that with respect to any claims covered under any of the policies which had been asserted against Amchem No. 1 prior to April 1, 1979, and which related to the metal working chemical products business, were deemed covered under such policies; in other words, such existing and asserted claims constituted a basis for coverage under the Insurers' policies and were thus considered "assets" relating to the metal working chemical products business.
[7] This statement, however, is a self-serving post transaction conclusion asserted in this litigation. The record presented to us does not reflect that Amchem No. 2 agreed to any such characterization of the policies issued by the Insurers.
[8] We have found nothing in the record before us reflecting a specific agreement between Amchem No. 1 and Amchem No. 2 regarding the latter's right to call upon liability insurance covering claims existing but not asserted as of April 1, 1979.
[9] We have greatly simplified our summary of these very complex corporate histories, but the relevant background facts are stated sufficiently to provide an accurate context for our consideration of the validity of Henkel's claims for recovery of defense and indemnification (i.e., settlement) expenses incurred in connection with the Lockheed litigation arising out of Amchem No. 1's metal working chemical product business during the 1959-1976 time period.
[10] The chemical products identified by the plaintiffs in the Lockheed litigation as being the responsibility of Henkel were products identified as Alodine 600, Alodine 1200 and Alodine 12005. These products all had been produced and marketed by Amchem No. 1 prior to its April 1, 1979 divestiture of its metal working chemical products business to Amchem No. 2.
[11] Henkel also tendered the litigation to its own insurers which had issued policies directly to Henkel. We are not concerned with the coverage claims (or disputes, if any) which may have arisen out of those tenders. We have before us only the claims against the Insurers which had provided liability coverage to Amchem No. 1 during the period 1959-1976.
[12] While not directly relevant to the issues before us, some allocation obviously is required as to the portion of the settlement and defense costs which are fairly attributable to the 1959-1976 time period for which it is claimed that the Insurers have coverage liability. A determination of the proper allocation of Henkel's defense and settlement costs is one of the issues that the trial court may have to resolve upon remand.
[13] In rejecting that argument, the trial court relied primarily upon the decision in General Accident Ins. Co. v. Superior Court (1997) 55 Cal.App.4th 1444, 64 Cal.Rptr.2d 781. As the trial court put it, "it doesn't make common sense or business sense to require an insurance company to indemnify a party that it never agreed to provide insurance to and also wherein that insurance company never had the right or opportunity to assess the risk associated with that. I think that would fundamentally impact the entire insurance industry and would really change the nature of insurance. The insurance companies, especially in the business world, would not have the opportunity to adequately assess risk when determining premiums associated with a policy."
[14] As do the parties, we make the assumption that the conduct alleged in the Lockheed litigation was actually or potentially covered under the Insurers' policies issued during the 1959-1976 time period. That assumption, however, is only for the purposes of this appeal. Upon remand, it will be Henkel's burden to prove that the claims made in the Lockheed litigation fell within the coverage provided by the Insurers' policies. Proof of the existence of any exclusionary policy provisions sufficient to preclude such coverage would, under settled principles, be the burden of the Insurers. (Aydin Corp. v. First State Ins. Co. (1998) 18 Cal.4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213.)
[15] We discuss the impact of the "no assignment" clause in more detail below.
[16] However, as we only have pleadings from the Lockheed litigation before us, we cannot determine just which of the claims of the several Lockheed plaintiffs triggered coverage under the Insurers' policies. That will be another matter to be resolved by the trial court upon remand. Henkel will have to establish just which portion of the defense and settlements costs which it expended are attributable to the claims covered by the Insurers' policies.
[17] In Northern, the predecessor had agreed to hold the successor harmless; in our case, the opposite was true. This is an interesting, but insignificant, distinction. It does not detract from the force of Northern's articulation and application of the fundamental principles governing the transfer, by "operation of law" of the right to policy benefits due on existing claims. The Northern court's reasoning and decision was not impacted by the indemnification commitment made by the predecessor.
[18] We do not intend to suggest by our endorsement of the reasoning and decision in Northern that the parties could not have expressly entered into a contract providing for a waiver by Amchem No. 2 of the right it would otherwise have to call upon relevant liability policies for coverage of claims arising from pretransfer injuries. Upon the making of such an express waiver agreement, Amchem No. 2 would be then properly chargeable with knowledge that liability insurance was not available should claims be asserted after the transfer; and would be on notice of the need to purchase "claims made" or other insurance providing "prior acts" coverage. As we have repeatedly noted, the record before us reflects no such express waiver agreement.
[19] Significantly, it is not at all clear from the opinion when such injuries occurred or whether coverage was ever triggered under the relevant policies.
[20] There is also another problem with the Quemetco decision. We question its reliance on the fact that the successor's liability was based on CERCLA. The Quemetco court did this in order to distinguish itself from Northern. We see no significance, however, in the fact that CERCLA liability did not exist at the time of the transfer of the assets of the predecessor to the successor corporation. Had the predecessor remained in business it would have been liable under the subsequently enacted CERCLA statute; and it would have been entitled to call upon the same liability policies to which the Quemetco court denied the successor access.

As Justice Johnson stated in Quemetco in his dissent from the majority's opinion:
"While it is true [Northern] involved `successor liability' in the context of a product liability case, there is no reason its rationale would fail to apply where `successor liability' was imposed in a different sort of case.... If the law holds the successor liable for its predecessor's tortious actsno matter the nature of those actsthen the law likewise transfers the insurance benefits covering liability for those acts to the successor.. .. [¶] The majority attempts to make something of the fact the particular causes of action involved in the underlying lawsuit here were predicated on CERCLA, a statute which did not come into existence until several years after the predecessor last dumped toxic chemicals into Stringfellow and several years after the predecessor corporation sold out to the successor corporation.... [¶] What is relevant is whether the predecessor's acts occurred before the sale, not whether they matured into cognizable causes of action before that time.... [¶] Had the predecessor corporation not sold out can there be any doubt its insurer would have had a duty to defend and indemnify that corporation in the strict liability lawsuits filed under CERCLA, even though those suits were based on a statute enacted years after the corporation's toxic dumping? Since there was a sale, however, the successor corporation was found liable under CERCLA for that toxic dumping, on a `successor liability' theory. Further, because the predecessor corporation's insurer would have been responsible for its insured's acts of toxic dumping even though its liability would have been based on CERCLA, a law passed years after the dumping, it likewise is responsible for defending and indemnifying the successor corporation for its liability under CERCLA. As [Northern ] emphasized, insurance benefits follow liability. And, I submit, that principle extends to liability which is expanded by legal changes occurring after the transfer takes place." (Quemetco, supra, 24 Cal.App.4th at pp. 507-508, 29 Cal.Rptr.2d 627; fn. omitted; disn. opn. of Johnson, J.).
[21] In support of this conclusion, the court discussed and relied on a number of cases which dealt with attempts to extend coverage under expired policies to cover corporate acquisitions which take place after the policies in question had expired. (General Accident, supra, 55 Cal.App.4th at pp. 1453-1454, 64 Cal.Rptr.2d 781.) Such efforts to create liability coverage after the fact were rightly rejected as they would have constituted an ex post facto attempt to change the name of the insured. (See Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal.App.4th 1094, 1107-1111, 37 Cal.Rptr.2d 508; Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co. (1996) 45 Cal.App.4th 1, 80, 52 Cal.Rptr.2d 690; A.C. Label Co. v. Transamerica Ins. Co. (1996) 48 Cal.App.4th 1188, 1194, 56 Cal.Rptr.2d 207.) These cases, however, were not really relevant to the issues before the General Accident court.

General Accident also relied upon Oliver Machinery Co. v. United States Fid. & Guar. Co. (1986) 187 Cal.App.3d 1510, 232 Cal. Rptr. 691 as a basis for criticizing the decision in Northern. (General Accident, supra, 55 Cal.App.4th at pp. 1451-1452, 64 Cal.Rptr.2d 781.) However, we agree with Justice Johnson's comments in his dissent in Quemetco. As the author of the Oliver decision, he was in a unique position to characterize its relevance to the Northern decision: "In Oliver, this court was concerned with the issue of the successor corporation's insurance policy and whether it covered an `additional insured' on that contract, a distributor, for injuries caused by the predecessor corporation's products when the contract specifically limited coverage to the successor corporation's products. This is entirely unrelated to the question of whether the benefits of the predecessor company's insurance policy passed to the successor by operation of law as to injuries which occurred before the successor bought out the predecessor. The former issue, of course, is a matter of construction of the contract the `additional insured' signed with the insurance company. But that has nothing to do with the issue of whether and which benefits pass to the successor corporation from the predecessor corporation related to injuries the predecessor corporation's actions already have caused." (Quemetco Inc. v. Pacific Automobile Ins. Co., supra, 24 Cal.App.4th at p. 504, 29 Cal. Rptr.2d 627; italics added; fn. omitted; disn. opn. of Johnson, J.) In spite of such a lack of relevancy to the issue presented in Northern, the General Accident court appeared to be critical of Northern's failure to mention the Oliver decision. (General Accident, supra, 55 Cal.App.4th at pp. 1451-1452, 64 Cal.Rptr.2d 781.) Beyond that, however, General Accident supplied no analysis as to why Oliver should dilute the force of Northern's reasoning or conclusion.
[22] Our decision is also limited to Henkel's claim for coverage under the relevant policies of Insurers. To the extent that such coverage is found not to exist or has been exhausted by the payment of prior claims, we see no basis on this record for Henkel obtaining any contribution from Rhone. That issue does appear to have been put to rest by the agreement of Amchem No. 2 to assume all of the liabilities of Amchem No. 1. While we have concluded that Henkel is entitled to look to the Insurers' relevant policies, we do not go further.